### In re: NORTHERN DISTRICT OF CALIFORNIA "DALKON SHIELD" IUD PRODUCTS LIABILITY LITIGATION.

#### No. C–80–2213 SW.

United States District Court,
N. D. California.

Nov. 5, 1981.

---

Anthony J. Klein, Digiorgio, Davis & Klein, Bakersfield, Cal., John J. Davids, Conklin, Davids & Friedman, San Francisco, Cal., Sherwood & Hensley, William A. Hensley, Wichita, Kan., Gary R. Silverman, Chubb & Silverman, Sparks, Nev., Ronald P. Schneider, Huster & Schneider, Boccardo, Blum, Lull Niland & Bell, Thomas J. Brandi, Abramson & Bianco, San Francisco,

Cal., Louis M. Bernstein, Oakland, Cal., Kent A. Russell, San Francisco, Cal., Robert J. Appert, Appert & Pyle, Minneapolis, Minn., Ralph B. Wegis, Taft, Cal., Rodney A. Klein, Inc., Sacramento, Cal., Walkup, Downing, Shelby, Bastian et al., San Francisco, Cal., Rupert H. Ricksen, Knox, Ricksen, Snook, Anthony & Robbins, Oakland, Cal., John St. John, Armour, St. John, Wilcox & Goodin, San Francisco, Cal., Bradley Post, Post, Syrios & Bradshaw, Wichita, Kan., Douglas E. Bragg, Denver, Colo., Sidney L. Matthew, Gorman & Matthew, Tallahassee, Fla., Brown & Szaller, Cleveland, Ohio, Norman G. Axe, Santa Monica, Cal., Robert B. Keddie, Behrend, Aronson & Morrow, Pittsburgh, Pa., William O. Bradley, Bradley & Drendel, Reno, Nev., Stanley Bell, San Francisco, Cal., John Van Dyke, Fullerton, Cal., Thomas W. Hauser, San Diego, Cal., Ed Stapleton, Brownsville, Tex., Paul D. Rheingold, New York City, Arthur C. Johnson, Johnson, Harrang, Swanson & Long, Eugene, Or., for plaintiffs.

Robert C. Gebhardt, Bronson, Bronson & McKinnon, Thomas W. Kemp Jr., Washburn, Kemp & Wagenseil, Scott Conley, Sedgwick, Detert, Moran & Arnold, San Francisco, Cal., Franklin M. Tatum, McGuire, Woods & Battle, Stephen W. Brewer, Mays, Valentine, Davenport & Moore, Richmond, Va., for defendants.

## MEMORANDUM OF OPINION AND ORDER CONDITIONALLY CERTIFYING CLASS ACTIONS

SPENCER WILLIAMS, District Judge.

### INTRODUCTION

The latter half of the twentieth century has witnessed a virtual explosion in the frequency and number of lawsuits filed to redress injuries caused by a single product manufactured for use on a national level. Indeed, certain products have achieved such national notoriety due to their tremendous impact on the consuming public, that the mere mention of their names—Agent Orange, Asbestos, DES, MER/29, Dalkon Shield—conjure images of massive litigation, corporate stonewalling, and infrequent yet prevalent, "big money" punitive damage awards.

In a complex society such as ours, the phenomenon of numerous persons suffering the same or similar injuries as a result of a single pattern of misconduct on the part of a defendant is becoming increasingly frequent.

The judicial system's response to such repetitive litigation has often been blind adherence to the common law's traditional notion of civil litigation as necessarily private dispute resolution.[1] In situations where this traditional mode of litigation threatens to leave large numbers of people without a speedy and practical means of redress and simultaneously threatens to expose defendants to continuing punishment for the same wrongful acts, the class action device is a powerful tool to accomplish its proclaimed goals of judicial economy and fairness.[2]

### Factual Background

This action involves the claims of thousands of women across the United States that they have been injured by an allegedly defective intrauterine device called the Dalkon Shield.

The Dalkon Shield was invented in 1968. It was clinically tested from September 1968 to November 1969, at which time it was commercially introduced to the medical profession by the Dalkon Corporation. On June 12, 1970, the A. H. Robins Co., Inc. (Robins), a manufacturer and distributor of pharmaceuticals and other products, acquired all rights to the Dalkon Shield. Robins then initiated its own program to test the product and simultaneously began to market it. Between June 12, 1970, and

---

1. Miller, of Frankenstein Monsters and Shining Knights: Myth, Reality, and the "Class Action Problem," 92 Harv.L.Rev. 664, 667–70 (1979).

2. See Advisory Committee Note to the 1966 Amendments to Rule 23, 39 F.R.D. 98 (1966); 7 Wright, Miller & Kane, Federal Practice and Procedure, § 1751 (1980 ed.); Grad v. Memorex Corp., 61 F.R.D. 88 (N.D.Cal.1973).

June 28, 1974, approximately 2.2 million Dalkon Shields were inserted in women in the United States. On the latter date, Robins suspended distribution of the Dalkon Shield.

A Dalkon Shield could be inserted only by a physician, who normally obtained the device from a surgical supply house. Each Dalkon Shield package contained labeling instructions and materials that described its advantages and disadvantages. It was the physician's responsibility to explain to the prospective wearer these advantages and disadvantages and, if the decision was made to have the Dalkon Shield inserted, to perform certain preliminary fitting procedures outlined in the labeling instructions.

During the years in which the Dalkon Shield has been utilized, a large number of women have had adverse reactions to the device. The plaintiffs in these actions allege that they have sustained various injuries from their use of the Dalkon Shield including uterine perforations, infections, pregnancy, spontaneous abortion, fetal injuries and hysterectomies. The plaintiffs predicate their right to recover against various defendants on theories of negligence, strict products liability, breach of warranty, conspiracy and fraud. In the vast majority of these actions, the plaintiffs seek substantial sums in punitive damages.[3]

At the present time, some 1,573 suits involving claims for compensatory damages well over $500 million and claimed punitive damages in excess of $2.3 billion, are pending against A. H. Robins.[4] The potential for the constructive bankruptcy of A. H. Robins, a company whose net worth is $280,394,000.00, raises the unconscionable possibility that large numbers of plaintiffs who are not first in line at the courthouse door will be deprived of a practical means of redress.

The problem raised by this litigation is that the cases filed against the defendant, including the 165 pending in this district, involve nearly identical complaints, nearly identical legal claims, and a nearly identical factual background as to all issues of liability. As this court knows from its own experience in trying one nine-week case in 1980, any attempts to try all these cases would bankrupt the district court's calendar and result in a tedium of repetition lasting well into the next century.

Due to the national importance of the issues involved in this litigation, the court has not acted precipitously with respect to class certification, opting instead for a more deliberate approach. The court conducted a series of status conferences to discuss various methods for achieving economies of time and expense in the trial of these actions.

On February 9, 1981, the court ordered briefing from all parties on the class certification issue. After careful consideration of these briefs and the arguments of all counsel at several subsequent hearings, the court issued its order conditionally certifying this class action.[5]

## CERTIFICATION OF A CLASS ACTION

The power of a trial court to limit re-examination of legal disputes by the use of representative suits has its genesis in the old court of equity's recognition of the "bill of peace." Developed as a procedural device to prevent a multiplicity of actions at common law, the bill of peace permitted consolidation of numerous actions involving common issues in a single suit in equity.[6] The device was often utilized when many

3. For a further, although adversarial, presentation of facts see, Van Dyke, The Dalkon Shield: A "Primer" in IUD Liability, 6 Western State Univ.L.Rev. 1. (1978).

4. See Affidavit of R. P. Wolf, Secretary and Assistant General Counsel of A. H. Robins Company. (June 19, 1981).

5. *In re: Northern District of California "Dalkon Shield" IUD Products Liability Litigation*, 521 F.Supp. 1188 (N.D.Cal.1981).

6. See generally 1 Pomeroy, Equity Jurisprudence, §§ 252, 253 (1918); Z. Chafee, Bills of Peace with Multiple Parties, 45 Harv.L.Rev. 1297 (1932); 1 H. Newberg, Class Actions, § 1004 (1977 ed.).

parties were making claims as to the same property or fund.[7]

The class action was a logical extension of the court's equitable jurisdiction over bills of peace and was accepted early on by American courts.[8] Trial courts retained their broad equitable powers to prevent a multiplicity of actions when a large number of persons with a single legal grievance sued or threatened to sue a defendant for alleged misconduct arising out of identical treatment of class members.

■ In recognition of the large measure of discretion vested in the trial court to balance conflicting interests,[9] modern class actions retained the procedural rules which enable a trial court to issue orders regarding coordination of lawsuits even though no party to the action requests such order. The court has a duty, for example, to determine on its own motion whether or not a class action may be maintained.[10] Moreover, the court may *sua sponte* certify subclasses during the pendency of an action without being bound by the plaintiff's complaint.[11]

The fact that no plaintiff in this district sought class relief is not dispositive of the power of this court to certify a class action for two reasons.[12]

■ First, it is now recognized that a federal district court has broad and inherent power to regulate litigation before it.[13] This inherent power, which is broader and more flexible than the authority granted in the federal rules, is derived from the court's duty to achieve expeditious disposition of cases.

■ Exercise of the court's power to control litigation is particularly appropriate in cases where a class action could reduce a multiplicity of identical suits.[14] As this court stated in its previous order,[15] the trial judge enjoys a wide range of discretion in overseeing all aspects of class action litigation particularly in determining the certification issue.[16] In fact, the court has more control over the class action than over ordi-

7. *See, e. g., Hom v. Tenants of Bromsgrove,* 22 Eng.Rep. 277 (Ch. 1681); *Brown v. Vermuden,* 22 Eng.Rep. 802 (Ch. 1676).

8. *See* J. Story, Equity Pleadings, § 97 (3d ed. 1944); Note, Action Under the Codes Against Representative Defendants, 36 Harv.L.Rev. 89 (1922); *Smith v. Swormstedt,* 57 U.S. [16 How.] 288, 14 L.Ed. 942 (1854); *Supreme Tribe of Ben-Hur v. Cauble,* 255 U.S. 356, 41 S.Ct. 338, 65 L.Ed. 673 (1921).

9. *See* Cohn, The New Federal Rules of Civil Procedure, 54 Geo.L.J. 1204, 1214 (1966).

10. *Senter v. General Motors Corp.,* 532 F.2d 511, 520–21 (6th Cir.), *cert. denied,* 429 U.S. 870, 97 S.Ct. 182, 50 L.Ed.2d 150 (1976); *Castro v. Beecher,* 459 F.2d 725, 731 (1st Cir. 1975); *Stevenson v. Smith,* 73 F.R.D. 79 (D.Del. 1976); Frankel, Some Preliminary Observations Concerning Civil Rule 23, 43 F.R.D. 39 (1967).

11. Fed.R.Civ.P. 23(c)(1); *Carr v. Conoco Plastics, Inc.,* 423 F.2d 57, 58 (5th Cir.) *cert. denied,* 400 U.S. 951, 91 S.Ct. 241, 27 L.Ed.2d 257 (1970); *Philadelphia Elec. Co. v. Anaconda American Brass Co.,* 43 F.R.D. 452, 462–63 (E.D.Pa.1968).

12. The court is aware of plaintiffs in other jurisdictions who have fashioned their lawsuits as class actions. *See, e. g., National Women's Health Network v. A. H. Robins Company,* No. C–81–0004–N (D.Mass. filed Jan. 12, 1981). Additionally, at least one plaintiff filed a brief in support of this court's announced decision to certify a class.

13. *Link v. Wabash Railroad Co.,* 370 U.S. 626, 629–31, 82 S.Ct. 1386, 1388–89, 8 L.Ed.2d 734 (1962) (*sua sponte* dismissal for lack of prosecution): *Van Bronkhorst v. Safeco Corp.,* 529 F.2d 943, 951 (9th Cir. 1976); *Doe v. Rostker,* 89 F.R.D. 158, 163 (N.D.Cal.1981).

14. *American Pipe & Constr. Co. v. Utah,* 414 U.S. 538, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974) (Rule 23 is designed to avoid the "multiplicity of activity" on the part of courts and litigants.).

15. *In re: Northern District of California "Dalkon Shield" IUD Products Liability Litigation,* 521 F.Supp. 1188 (N.D.Cal.1981).

16. *Gardner v. Westinghouse Broadcasting Co.,* 559 F.2d 209, 212 (3d Cir. 1977), *aff'd,* 437 U.S. 478, 98 S.Ct. 2451, 57 L.Ed.2d 364 (1978); *Price v. Lucky Stores Inc.,* 501 F.2d 1177, 1182 (9th Cir. 1974).
*Yaffe v. Powers,* 454 F.2d 1362, 1367 (1st Cir. 1972); 3B J. Moore, Federal Practice, ¶ 23.50 (2d ed. 1980); 7 Wright, Miller & Kane, Federal Practice and Procedure, § 1785 (1980 ed.).

nary actions, and thus must assume a more active role in its certification and management.[17]

■ Nothing in Rule 23 prohibits a court from certifying a class action when to do so would result in both a major savings of judicial time in avoiding repetitive litigation and the preservation of the collective interests of all class members.[18] Any alleged limitations contained in Rule 23 as to the exercise of the court's class action jurisdiction do not control the result of this case because the federal rules state that they were not intended to limit the pre-existing jurisdiction of the federal courts.[19]

■ It is well-established that courts tried representative suits, in the interest of judicial efficiency, long before the adoption of Rule 23.[20] As noted above, this case was cognizable under the court's equity jurisdiction.[21] Therefore, the trial court in exercising its equity power may certify a class even when no individual plaintiff fashions his complaint to seek such relief.

■ The inherent powers of the trial court in conducting a class action lawsuit clearly vest it with the authority to certify a class when such a decision is in the collective best interest of the plaintiffs.[22] As this court stated in its previous order:

In this action, plaintiffs are represented by many different law firms, each with an individual interest in securing a punitive damage award for their clients. The court, on the other hand, is in the best position of being able to observe the spectrum of cases filed throughout the country with only the *collective* interest of the plaintiffs in mind.[23]

In light of this factual finding, and the observed need to prevent an unnecessary race to the courthouse door, the most equitable solution is certification of a class designed to insure equal access to a recovery fund.

There is a second reason supporting this court's decision to certify this class. On June 26, 1981, the defendant filed a Motion for Class Certification of a Rule 23(b)(1)(B) class of all persons who have claims against it for punitive damages.

■ It is axiomatic that either a plaintiff or a defendant may move for class certification.[24] That a defendant may move for class certification is particularly compelling in the context of a 23(b)(1) class suit as that subdivision, like equity's "bill of peace," is designed to protect the plaintiff and the

17. C. Wright, Class Actions, 47 F.R.D. 169, 185 (1969).

18. While at least one court appears to have fastened on the reference in Rule 23(c)(1) to actions "brought" as class suits as preventing the *sua sponte* grant of class relief, *Wilson v. Zarhadnick*, 534 F.2d 55, 57 (5th Cir. 1976), no less an expert on Rule 23 than Professor Moore concludes that the trial court's expanded role under the rule contemplates situations in which a court may transform an action commenced as a non-class action on its own motion. 3B J. Moore, Federal Practice, ¶ 23.02 (2d ed. 1980).

19. Fed.R.Civ.P. 82; *accord, Brennan v. Silvergate District Lodge No. 50*, 503 F.2d 800, 804 (9th Cir. 1974).

20. *Hom v. Tenants of Bromsgrove*, 22 Eng.Rep. 277 (Ch. 1681); 7 Wright, Miller & Kane, Federal Practice and Procedure, § 1751 (1980 ed.); Z. Chafee, Some Problems of Equity (1950).

21. *See* note 6 *supra*.

22. This court notes that the certification of a class in these cases also serves to extricate

many plaintiffs' counsel from the representation of clients with conflicting interests. *See*, California Rules of Professional Conduct No. 5–102(B); ABA Disciplinary Rule No. 5–105. Plainly, a lawyer with two clients, one of whom is ready for immediate trial and the other who has little hope of an early trial date, represents parties with conflicting interests. The early punitive damage recovery of plaintiff No. 1 necessarily will effect the right of plaintiff No. 2 to monetary recovery. As such, the plaintiffs' lawyer is placed in the unethical position of advising one client to pursue his right, to the detriment of the other client.

23. *In re Northern District of California "Dalkon Shield" IUD Products Liability Litigation*, 521 F.Supp. 1188, 1192 (N.D.Cal.1981).

24. *See Stevenson v. Smith*, 73 F.R.D. 79 (D.Del. 1976); Kubin, Determining Class Maintainability in California, 27 Hastings L.J. 293, 297 (1975). *See generally Argo v. Hills*, 425 F.Supp. 151, 159 (E.D.N.Y.1977).

defendant from the prejudice caused by the filing of multiple suits. The analogy to the "bill of peace" is persuasive since in that context the defendant could resort to the equity court for such relief.[25]

■ Accordingly, the court hereby grants the defendant's motion.

The class action certified in this case, however, is limited to two basic issues.[26] First, this court does not purport to restrict in any fashion an out-of-state plaintiff's right to sue A. H. Robins Company, or any other defendant, for compensatory damages arising out of her use of the Dalkon Shield. On the contrary, this court simply is attempting to coordinate the plaintiffs' national claims for punitive damages. While this coordination will prevent any one plaintiff from receiving an individual "windfall" punitive damage award, it will also insure the right of *all* plaintiffs to some proportionate share of any punitive damage recovery.

Second, with regard to plaintiffs who have chosen to file in federal courts located in California, this court is exercising its broad discretion to eliminate repetitious litigation by certifying an issues-only class action on the question of the drug company's liability arising from the manufacture and sale of the Dalkon Shield. Not only will these plaintiffs have the right to opt out of this statewide class action on the liability issue, but each plaintiff will, if the class is successful, return to her own court for a determination of individual issues such as damages, causation and other affirmative defenses.

The following constitutes a discussion of the court's reasons for certifying these two class actions.

## CERTIFICATION OF CLASS ON PUNITIVE DAMAGES

■ Rule 23(b)(1) allows class actions to avoid creating a risk of incompatible standards of conduct for the party opposing the class, or of judgments for some class members that threaten the interests of others, if separate actions are prosecuted.[27] Termed the "prejudice" class action provision,[28] Rule 23(b)(1) permits class actions as a method of obviating potential prejudice and inconsistencies which may result to the parties from a series of individual actions. Structurally, this provision is divided into two clauses, (A) and (B), which appropriately can be characterized as two sides of the same coin.[29]

Rule 23(b)(1)(A) takes as its focal point the possible adverse effects individual actions may have on the party opposing the class.[30] This subdivision is designed to prevent the party opposing the class from being forced into incompatible standards of conduct.[31]

**25.** *See,* Z. Chafee, Bills of Peace With Multiple Parties, 45 Harv.L.Rev. 1297 (1932).

**26.** Fed.R.Civ.P. 23(c)(4)(A) permits a class to be maintained with respect to particular issues.

**27.** *Causey v. Pan American World Airways, Inc.,* 66 F.R.D. 392 (E.D.Va.1975).

**28.** *In re "Agent Orange" Product Liability Litigation,* 506 F.Supp. 762, 789 (E.D.N.Y.1980).

**29.** Fed.R.Civ.P. 23(b)(1)(A) and (B) provide:
(b) Class Actions Maintainable.
An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:
(1) the prosecution of separate actions by or against individual members of the class would create a risk of
(A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or
(B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; . . .
*See La Mar v. H & B Novelty & Loan Co.,* 489 F.2d 461 (9th Cir. 1973).

**30.** 7A Wright, Miller & Kane, Federal Practice and Procedure, § 1773 (1980 ed.); *see also Green v. Occidental Petroleum Corp.,* 541 F.2d 1335, 1340 n.10 (9th Cir. 1976).

**31.** Although the court is not characterizing this as an interpleader situation, the amount of punitive damages recoverable against Robins, is, at least in theory, a sum certain for interpleader purposes. Conceptually, this sum certain can be viewed as a limited fund.

Subdivision B, upon which this court relies, permits class actions in situations where separate suits prejudicially affect the class members. This subdivision emphasizes the potential undesirable effects on class members, rather than on the party opposing the class. Subdivision B applies when individual adjudication would, as a practical matter, dispose of the interests of class members who are not parties or substantially impair or impede the ability of absent class members to protect their interests. Fed.R.Civ.P. 23(b)(1)(B). If individual actions inescapably alter the substance of the rights of others having similar claims, Rule 23(b)(1)(B) becomes operative.[32]

Class certification under Rule 23(b)(1)(B) generally is designed to accomplish equitable distribution of a limited fund to all members of a proposed class who have a claim and whose interest may otherwise be impaired by damage awards in individual actions that deplete or diminish the fund.[33]

The Advisory Committee Notes state that (b)(1)(B) applies to "situations where the judgment in a nonclass action by or against an individual member of the class, while not technically concluding the other members, might do so as a practical matter." [34]

Neither the Rule nor the Advisory Committee Notes requires proof that claims "will", as a certainty, exhaust the fund. Certification is appropriate if individual actions "may" affect the claims of parties not before the court.

The instant matter is properly maintained as a Rule 23(b)(1)(B) action. At issue here is a limited common fund potentially exhaustible by some of the prospective claimants. Claims in excess of $3 billion have been filed thus far, and A. H. Robins' assets currently equal $280 million.[35] There is good reason to believe that the total judgments may exceed, to a substantial degree, the ability of A. H. Robins to respond. Although the court makes no determination as to the liability of A. H. Robins, the court notes that it cannot be said with assurance that A. H. Robins can satisfy the judgments *in toto.*

The situation presented here is identical to that in *Coburn v. 4–R Corp.,* 77 F.R.D. 43 (E.D.Ky.1977). In *Coburn,* claims in excess of $1.5 billion were filed, and the assets of the defendant were approximately $3 million. The court held the matter maintainable as a Rule 23(b)(1)(B) class action and stated:

> In no event, however, should this litigation become an unseemly race to the courtroom door with monetary prizes for a few winners and worthless judgments for the rest.[36]

The threat of constructive bankruptcy pervades this matter, and as in *Coburn,* this court views Rule 23(b)(1)(B) as the most practical method of avoiding the "race to the courthouse" syndrome.

This situation is distinguishable from that of *In re "Agent Orange" Product Liability Litigation,* 506 F.Supp. 762 (E.D.N.Y.1980). In *Agent Orange* there were five named defendants who suffered no threat of real or constructive bankruptcy. The court noted the unlikelihood of insolvency and rejected the idea of a Rule 23(b)(1)(B) class action on the ground that it was not a situation of multiple claimants who may deplete the fund and leave nothing for the late-comers *Id.*

We have here the situation noted in *Green v. Occidental Petroleum Corp.,* 541 F.2d 1335 (9th Cir. 1976), an instance where mass tort litigation is appropriately handled as a class action. In a footnote, the *Green*

---

**32.** *See Green v. Occidental Petroleum Corp.,* 541 F.2d 1335, 1340 (9th Cir. 1976).

**33.** 3B J. Moore, Federal Practice ¶ 23.35[2] (2d ed. 1980); *see also Dickinson v. Burnham,* 197 F.2d 973 (2d Cir.), *cert. denied,* 344 U.S. 875, 73 S.Ct. 169, 97 L.Ed. 678 (1952).

**34.** Notes of Advisory Committee on Rules, 39 F.R.D. 69, 100–101 (1966)

**35.** Moreover, it now appears that the claims filed against this defendant are increasing in number *See* Affidavit, Robert G. Watts, filed September 22, 1981.

**36.** 77 F.R.D. 43, 45.

court reasoned that the claims of the named plaintiffs would substantially impair or impede the interests of other members not parties to the adjudication where the *claims of all plaintiffs exceeded the assets of the defendant. Id.* at 1340 n.9. In such a situation, a group of individuals would be allowed full compensation which would impair the rights of those not in court.

A limited fund exists in this case for another compelling reason. It is clear that successive trials of individual claims may "as a practical matter be dispositive" of the rights of other members of the class because there certainly is an implied in law ceiling on the amount of punitive damages that may be assessed against the defendant company.[37]

It is almost certain that an award of punitive damages to a plaintiff in one case will alter the potential recovery of a plaintiff in a later filed suit. In theory, when a plaintiff recovers punitive damages against a defendant that represents a finding by the jury that the defendant was sufficiently punished for the wrongful conduct. If the jury's verdict constitutes excessive punishment, the trial judge is empowered to use remittitur to reduce the award to the proper amount.

If plaintiff No. 1 recovers one million dollars in punitive damages, plaintiff No. 2 runs a serious risk of being told that the amount awarded in the first suit represented an implied finding of the maximum amount the defendant should be punished. Obviously, the greater the number of plaintiffs, the more serious the risk becomes that the late plaintiff will find her demand for punitive damages dismissed.[38] At the very least, the trial court may admit evidence as to the payment of prior awards working to the detriment of a party seeking additional punishment for the same misconduct.[39]

Finally, in light of the fact that no plaintiff has a right to punitive damages, courts are likely to solve the inherent practical and constitutional problems with multiple punishment for the same conduct by creating doctrines severely limiting the right to recover punitive damages in the mass tort situation. The United States Supreme Court has often recognized that limitations, up to and including elimination, may be placed on the power to award punitive damages if there exists a strong countervailing interest.[40] As such, the interest underlying the due process rights of the defendant rises to such a level.

## THEORY OF PUNITIVE DAMAGES

Punitive damages in product liability litigation have the potential not only to punish a defendant but to severely damage its finances. In mass tort liability situations the inequity and harmful effect of civil punitive damages are multiplied many times over.

There is no "right" to punitive damages, and the awarding of punitive

---

**37.** *See deHaas v. Empire Petroleum Co.,* 435 F.2d 1223, 1231 (10th Cir. 1970); *Roginsky v. Richardson-Merrell, Inc.,* 378 F.2d 832 (2d Cir. 1967). Plaintiffs have no right to, or vested interest in, punitive damages. Plaintiffs do, however, have a right to *seek* punitive damages. It is this right to seek that the consequences of individual actions will impair.

**38.** *See generally Globus v. Law Research Service, Inc.,* 418 F.2d 1276 (2d Cir. 1969), *cert. denied,* 397 U.S. 913, 90 S.Ct. 913, 25 L.Ed.2d 93 (1970); *Roginsky v. Richardson-Merrell, Inc.,* 378 F.2d 832 (2d Cir. 1967); *Maxey v. Freightliner Corp.,* 450 F.Supp. 955 (N.D.Tex. 1978); Putz & Astiz, Punitive Damage Claims of Class Members Who Opt Out: Should They Survive? —— U.S.F.L.Rev. —— (1981); Note, Mass Liability and Punitive Damages Overkill, 30 Hastings L.J. 1797 (1979); Coccia & Morrissey, Punitive Damages in Products Liability

Cases Should Not Be Allowed, 22 Trial L.Q. 46 (1978).

**39.** *State ex rel. Young v. Crookham,* 290 Or. 61, 618 P.2d 1268, 1272–73 (1980); *see generally* Redden, Punitive Damages, § 4.8 (1980); Restatement (Second) of Torts § 909 (1977); Morris, Punitive Damages in Tort Cases, 44 Harv.L. Rev. 1173, 1195 (1931).

**40.** *See, e. g., Newport v. Fact Concerts, Inc.,* —— U.S. ——, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981) (municipalities are immune from punitive damages); *International Brotherhood of Electrical Workers v. Foust,* 442 U.S. 42, 48–50, 99 S.Ct. 2121, 2125–27, 60 L.Ed.2d 698 (1979) (Labor Policy); *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 349–50, 94 S.Ct. 2997, 3011–12, 41 L.Ed.2d 789 (1974) (First Amendment).

damages lies completely within the discretion of the trier of fact.[41] As a general rule, punitive damages are recoverable in situations in which the defendant's misconduct involves intentional or malicious wrongdoing. The basis for punitive damages is their deterrent effect on the future conduct of the tort-feasor, and not their benefit to the specific victim.

■■■ Punitive damages are, to a large degree, a windfall to a plaintiff. The compensatory damage award serves the function of fully compensating the plaintiff for the injuries suffered. Punitive damages are exacted for the benefit of society with the intended effect of deterring defendant from similar conduct in the future. These awards are measured with an eye more to the total net worth of the defendant than to the actual damage suffered by the individual plaintiff. Since each jury in a mass tort litigation situation will award punitive damages for wrongful conduct that affected an entire class of injured parties, a series of separate actions may result in windfall awards to individual plaintiffs at the expense of a disproportionately punished defendant.

Punitive damage awards by juries can reach staggering amounts.[42] Where, as here, one act or omission creates an injury to more than one victim, the possibility of multiple actions against the defendant arises. The punitive damage award in any one of the actions might constitute a reasonable deterrent. Yet, each plaintiff is permitted to try her case in a vacuum, oblivious to other pending actions or to prior punitive damage awards. Each plaintiff may then receive a punitive damage award with the result that the cumulative awards financially destroy the defendant.

■■■ The purpose of punitive damages is to sting, not kill, a defendant. Punitive damages should not be permitted to bankrupt a defendant.[43]

The potential for abuse implicit in repeated awards of punitive damages based on the same conduct is presently ameliorated only by the tendency of trial and appellate judges to reduce the jury awards.

In *Roginsky v. Richardson-Merrell, Inc.*, 378 F.2d 832 (2d Cir. 1967), Judge Friendly discussed the implications of the potential for punitive damage "overkill." The court noted that it knew of no principle "whereby the first punitive damage award exhausts all claims for punitive damages and would preclude future judgments . . . ."[44] The court recognized, though, the difficulty in administering claims for punitive damages in a multiplicity of suits so as to avoid overkill.

A Rule 23(b)(1)(B) nationwide class action for punitive damages obviates many of the abuses inherent in multiple punitive damage awards.

■■■ A defendant has a due process right to be protected against unlimited multiple punishment for the same act. A defendant in a civil action has a right to be protected against double recoveries not because they violate "double jeopardy" but simply because overlapping damage awards violate that sense of "fundamental fairness" which lies at the heart of constitutional due process. Certainly the principle of *res judicata*, the notion that litigation must come to an end, that a party cannot sue or be sued repeatedly on the same cause of action, is a part of the process that is due under our constitutional system.

---

41. *See, e. g., Stoody Co. v. Royer*, 374 F.2d 672 (10th Cir. 1967).

42. In *Grimshaw v. Ford Motor Co.*, 119 Cal. App.3d 757, 174 Cal.Rptr. 348 (1981), the jury awarded the plaintiff $125 million in punitive damages. The jury based its award on the profit Ford Motor Company reaped from its omission to act properly. This award was later reduced by the trial court, and on appeal, the trial court was affirmed. *See also Pease v. Fletcher Jones Beech Aircraft* (Orange County, California, June, 1971 jury award of $17,250,-000 as punitive damages, later set aside); *Rosendin v. Avco-Lycoming* (Santa Clara County, California, March 1971 jury award of $10,500,-000 as punitive damages).

43. *See Wynn Oil Co. v. Purolator Chemical Corp.*, 403 F.Supp. 226 (M.D.Fla.1974).

44. 378 F.2d 832, 839.

■ Our law on punitive damages was created in an era of single plaintiff versus single defendant disputes and has not yet been adapted to the complexity of multi-party litigation. Common sense dictates that a defendant should not be subjected to multiple civil punishment for a single act or unified course of conduct which causes injury to multiple plaintiffs.[45]

Without a Rule 23(b)(1)(B) class action, the individual and cumulative awards of punitive damages may reach astounding amounts. How often is the defendant to be punished? Under the doctrine of punitive damages there is no limiting rule in such a situation. There is no fair way to guide the juries. There is no basis for priority to punitive damages among the claimants, or for awarding such damages to one or more and not to others. In light of the obvious application of punitive damages in the products liability context,[46] the class action is the best available device to protect the interests of all parties.

## STATEWIDE CLASS ACTION UNDER B(3)

■ In order to bring and maintain a class action, a potential litigant must satisfy all of the conditions of Rule 23(a) and must also establish that such action is appropriate under one of the subdivisions of 23(b).

a. *Numerosity.* Rule 23(a)(1) states that a prerequisite to certification is that "the class is so numerous that joinder of all members is impracticable,..." In this case, defendants have made a showing in their factual affidavits that there are at least several hundred potential class members. Moreover, this court alone has more than 160 prospective individual suits pending before it. The court finds that the numerosity requirement is satisfied.

b. *Commonality.* A second requirement for class certification is that "there are questions of law or fact common to the class,..." Fed.R.Civ.P. 23(a)(2). Each of the cases filed in California federal courts contain common issues of fact and law with respect to issues of design, testing, manufacturing, labeling and inspection of the Dalkon Shields and with respect to issues of negligence, strict products liability, adequacy of warnings at relevant time periods, breach of warranty, fraud and conspiracy.

c. *Typicality.* Rule 23(a)(3) further requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class,..."

■ If the representatives' claims or defenses, and the claims or defenses of the class members "stem from a single event or are based on the same legal or remedial theory," Rule 23(a)(3) is satisfied.[47] It is apparent in these Dalkon Shield cases that class members state claims arising out of the same factual setting and therefore the representative parties' claims are typical.

■ The more serious difficulty arises from the fact that, where different plaintiffs sue different defendants, "typicality is lacking when the representative plaintiffs' cause of action is against a defendant unrelated to the defendants against whom the cause of action of the members of the class lies."[48] However, the *La Mar* court articulated two exceptions to its strict rule. The court stated:

Obviously this position does not embrace situations in which all injuries are the result of a conspiracy or concerted schemes between the defendants at whose hands the class suffered injury. Nor is it intended to apply in instances in which all defendants are juridically relat-

---

**45.** Putz and Astiz, Punitive Damage Claims of Class Members Who Opt Out: Should They Survive?, —— U.S.F. L.Rev. —— (1981). *See* Note, Mass Liability and Punitive Damages Overkill, 30 Hastings L.J. 1797 (1979). *Cf. Western Union Telegraph Co. v. Pennsylvania,* 368 U.S. 71, 75, 82 S.Ct. 199, 201, 7 L.Ed.2d 139 (1961) (denial of due process unless the court before whom party is appearing can protect the defendant from claims in other courts).

**46.** *Wangen v. Ford Motor Co.,* 97 Wis.2d 260, 294 N.W.2d 437 (1980).

**47.** 7 Wright, Miller & Kane, Federal Practice and Procedure § 1764 (1980 ed.)

**48.** *La Mar v. H & B Novelty & Loan Co.,* 489 F.2d 461, 465 (9th Cir., 1973).

ed in a manner that suggests a single resolution of the dispute would be expeditious.[49]

This case falls within the exceptions recognized by *La Mar* in that plaintiffs have alleged a concerted scheme or conspiracy between defendants in the marketing, design, testing, and production of Dalkon Shields.

Moreover, there exists a juridical relationship between defendants which enables a single resolution of this action and precludes a multiplicity of similar actions.

The court [*La Mar*] merely discussed a few prior cases within which the court considered a juridical relationship sufficient to justify class treatment to exist. These cases involved class actions brought against state officials applying a common rule.... There is no discussion in *La Mar* of other possible types of juridical links that make class treatment of an action proper.[50]

The court in *In re Itel* went on to find a juridical link to permit class action treatment in that case, although the "specific kind of juridical link discussed in *La Mar* is not present in this case." [51]

This court, like the court in *In re Itel*, gives much consideration to the "great judicial convenience and economy which class certification would serve" in this case.[52] Accordingly, this court recognizes that an important legal relationship justifying class treatment in this case is that each defendant is united in a chain of privity that has allowed them to introduce the Dalkon Shield into the stream of commerce. Among the defendants are the inventors of the Dalkon Shield, the manufacturer and producer of the material and/or end product, and the distributor and/or supplier of the devices. All common issues of liability will necessarily entail careful examination of the role of each defendant in the alleged torts, the possible theories of liability as appropriate, and the impact of each defendant's role on all other defendants. For these reasons, the court finds the presence of juridical links necessary to allow this suit to proceed as a class action.[53]

d. *Adequacy of Representation.* The last requirement of Rule 23(a) is that "the representative parties will fairly and adequately protect the interests of the class." This rule has been interpreted to require (1) that the representative party be a forceful advocate and his chosen attorney must be an experienced advocate, and (2) the representative party must have interests which are compatible with the members of the class.[54]

The representative parties represent a wide spectrum of injuries and circumstances. Additionally, the court has no reason to suspect any antagonism between any of the absentees and the named plaintiffs. In fact, the interests of named plaintiffs are indistinguishable from those of the absentees. The many firms currently involved in this certification of the class have been involved in approximately 700 other Dalkon Shield cases. From its many interactions to date with the firms in this case, this court determines that whichever firm is chosen to represent named plaintiffs will vigorously and competently litigate the action.

*Rule 23(b)*

In addition to the requirements of Rule 23(a), certification depends on a demonstration that this action meets one of the alternative requirements of Rule 23(b) as well.

Rule 23(b)(3) states that if

the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and

---

**49.** *Id.* at 466.

**50.** *In re Itel Securities Litigation*, 89 F.R.D. 104, 118 (N.D. Cal. 1981).

**51.** *Id.*

**52.** *Id.* at 121.

**53.** This court will, if necessary, consider severing the case as to the individual defendants in order to retain jurisdiction.

**54.** *Shulman v. Ritzenberg*, 47 F.R.D. 202, 207 (D.D.C.1979).

that a class action is superior to other available methods for the fair and efficient adjudication of the controversy,[55] then the class action may be maintained.

a. *Mass Tort vs. Mass Products Liability.* Mass marketing of contraceptives such as the intrauterine device was the beginning of a modern phenomenon, and for several reasons does not fit in the category of "mass accident" torts. This situation more closely resembles that of personal injury suits alleging misfeasance or negligence by defendants over a long period of time.[56]

The framework originally implemented for the traditional litigation of tort injuries (one plaintiff versus one defendant) was not intended to and cannot effectively accommodate numerous individuals with grievances derived, in part or in whole, from mass marketing of medical devices or drugs. If such traditional structures are mechanically used merely for the convenience and familiarity of adhering to traditional practices, then a great many persons will be without effective and practical means of redress. This court's certification of a statewide federal district court litigants' class is properly within the scope of the historical function of courts and of Rule 23(b)(3).

b. *Predominance.* The first of two mandatory characteristics of a 23(b)(3) action is that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members."

In mass product liability cases such as these cases now before the court, the foremost difficulty lies in whether or not innumerable individual issues or complaints will subsume the common issues. There is the possibility that significant questions of individual injury, causation, and medical history would effect individual cases differently and the action then "would degenerate in practice into multiple lawsuits separately tried." [57]

This court does not maintain that this one class action suit disposes of the individual questions that inevitably would mandate separate trials. In the Order of Class Certification,[58] it was specifically mandated that these cases must return to the districts of original jurisdiction for further trial of individual application of the outcome of this class action.

More importantly, this class is brought together "more by a mutual interest in the settlement of common questions than it is divided by the individual members' interest in the matters peculiar to them." [59] Professor Moore would focus on whether the proposed class was "seeking to remedy a common legal grievance." [60] Professors Wright, Miller and Kane, however, would focus on whether there existed a "common nucleus of operative facts" that could be resolved in one adjudication.[60a] Both seem to reject quantitative measures of time and attention needed to resolve individual versus class issues.

In this case, the common nucleus of operative facts that lends itself to class adjudication is whether and when defendants knew or should have known of the dangers of the Dalkon Shield to its users. Most evidently, if any one plaintiff is to recover any measure of damages, she must establish defendants' liability on this issue. As previously stated, the facts surrounding defendants' design, production, etc. of the Dalkon Shield are the primary focus of this class

**55.** Fed.R.Civ.P. 23(b)(3).

**56.** *Mink v. Univ. of Chicago*, 460 F.Supp. 713 (N.D.Ill.1978).

**57.** *See* Advisory Committee Note to the 1966 Amendments to Rule 23, 39 F.R.D. 69, 103 (1966).

**58.** *In re Northern District of California "Dalkon Shield" IUD Products Liability Litigation* 521 F.Supp. 1188 (N.D. Cal. 1981).

**59.** 3B J. Moore, Federal Practice ¶ 23.45[2] (2d ed. 1980).

**60.** *Id.*

**60a.** 7A Wright, Miller & Kane, Federal Practice and Procedure § 1778 (1980 ed.).

action and if established, plaintiffs will prevail. Then and only then may plaintiffs proceed to the other issues in the suit: causation, damages and affirmative defenses. In this manner, bifurcation of these important issues adequately satisfies Rule 23(b)'s predominance requirements.

c. *Superiority.* The other major requirement of Rule 23(b)(3) is that class adjudication must be "superior to other available methods."

▉ In examining the interests of the class members, the importance of each member having her own day in court should be balanced against the great cost and technical difficulties of discovery and independent litigation in general.

There currently are more than 160 individual cases involving Dalkon Shields pending before this court. Pretrial proceedings have been delayed so that the class action could be pursued. If these individual cases are forced to be litigated one by one, the congestion ensuing for this court and the other district courts would produce an unnecessary and unprecedented burden on California's federal judicial system. The class action is the method of handling these cases so that disruption to the court system will be minimized.

The Northern District is the appropriate forum in which to concentrate the class action due to the number of cases filed in this district and based on this court's familiarity with the issues and procedures peculiar to this type of case. This court recently has concluded a trial involving a Dalkon Shield injury. The law firms of counsel involved in the many cases to be certified as a class are already in the vicinity of the Bay Area, or are in close contact with law firms in this area.

Although the class is so large that joinder is impracticable, it is not so great that management is impracticable. Bifurcation of the limited common issues, carefully designed procedures for discovery, deposition and introduction of evidence, and other additional court orders tailored to fit this action insure that manageability problems will be minimal.

▉ In summary, the certification of all plaintiffs who file Dalkon Shield cases in the federal courts of California up to and including the commencement of the trial in this action meets the prerequisites of Rule 23(a) and additionally satisfies the balancing factors of Rule 23(b)(3).

## MOTION TO VACATE CERTIFICATION ORDER

On August 31, 1981, the court heard lengthy argument on a motion brought by one plaintiff's counsel [61] to vacate the June 25, 1981 conditional certification order. After careful consideration of the excellent arguments and briefs of all counsel, the evidence in the record with regard to the incidence and potential for punitive damage awards, and all other matters in the record, this court orally denied the motion to vacate. The following constitutes the court's written opinion denying the motion.

### Personal Jurisdiction

The plaintiff's counsel begins by raising an important and fundamental question which strikes at the very heart of our jurisprudential system. The issue presented is whether a court may exercise *in personam* jurisdiction over a plaintiff's class action suit where some of the unnamed class members neither reside in nor have contacts with the forum state. Resolution of this question requires accommodation of the conflicting principles underlying representative adjudication and those supporting traditional restrictions on the exercise of personal jurisdiction.

**61.** The plaintiff's counsel (referred hereinafter as "plaintiff's counsel"), Bradley Post, is the lead liaison plaintiff's counsel at the Multi-District Litigation in Wichita, Kansas. Although Mr. Post's motion was joined in by several plaintiffs, this court does not wish to intimate that all plaintiffs nationwide joined or agreed with the objections raised at the hearing on this motion. However, Mr. Post raised several important points which are the subject of the remainder of this opinion.

As in almost all cases in which the issue of *in personam* jurisdiction arises,[62] there is no clean slate for the court's use, but only a cluttered board etched with over one hundred years of United States Supreme Court precedent.

In *Pennoyer v. Neff*, 95 U.S. 714, 24 L.Ed. 565 (1877), the United States Supreme Court held that a state's sovereign power, and hence the jurisdiction of its courts, was confined by the territorial boundaries of the state.[63]

In an opinion by Mr. Justice Field, the Court declared as a "principal of general, if not universal, law" that "in an action for money or damages where a defendant does not appear in the court, and is not found within the State, and is not a resident thereof but has property therein, the jurisdiction of the court extends only over such property...."[64]

After *Pennoyer*, the expansion of multistate enterprise and the development of the automobile posed problems for strict application of a territorial power theory.[65] Courts, therefore, developed fictional jurisdictional theories in an attempt to reconcile the territorial power theory with modern realities. Courts "inferred" physical power by asserting jurisdiction based on theories of implied consent, domicile and constructive presence.[66]

The wooden rule of *Pennoyer* was made more flexible in *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). The Supreme Court established a jurisdictional theory based on due process and fundamental fairness when it declared:

> [D]ue process requires only that in order to subject a defendant to a judgment *in personam* if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice."[67]

While there are no precise yardsticks by which to measure the necessary minimum contacts under the *International Shoe* standard, courts have stressed certain factors in reaching jurisdiction decisions.[68]

In *World-Wide Volkswagen v. Woodson*, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980), the high court's most recent pronouncement on jurisdictional standards, the Supreme Court affirmed the "minimum contacts" formula and stressed its dual functions—to protect a defendant from the burdens of "litigating in a distant or incon-

---

**62.** In determining the personal jurisdiction question, this court must first look to the applicability of the state's long-arm statute. California law permits state courts to exercise personal jurisdiction to the full extent permitted by the Constitution. *See* Cal.Civ.Proc. § 410.-10. Therefore the jurisdictional analysis becomes a search for the outer limits of what due process permits. *Forsythe v. Overmyer*, 576 F.2d 779, 782, *cert. denied*, 439 U.S. 864, 99 S.Ct. 188, 58 L.Ed.2d 174 (1978).

**63.** 95 U.S. 714, 720, 24 L.Ed. 565.

**64.** *Id.*

**65.** *See generally* Casad, *Shaffer v. Heitner*: An End to Ambivalence in Jurisdiction Theory? 26 Kan.L.Rev. 61, 63 (1977).

**66.** For a further discussion of the development of the post-*Pennoyer* jurisdiction adaptation *see* Kurland, The Supreme Court, the Due Process Clause and the *In Personam* Jurisdiction of State Courts—From Pennoyer to Denckla: A Review, 25 U.Chi.L.Rev. 569 (1958).

**67.** *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945) quoting *Milliken v. Meyer*, 311 U.S. 457, 463, 61 S.Ct. 339, 342, 85 L.Ed. 278 (1940).

**68.** The Ninth Circuit has developed a three-part test in all cases where general jurisdiction is not conceded:

> (1) The nonresident defendant must do some act or consummate some transaction with the forum or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws. (2) The claim must be one which arises out of or results from the defendant's forum-related activities. (3) Exercise of jurisdiction must be reasonable. *Data Disc, Inc. v. Systems Technology Assoc., Inc.*, 557 F.2d 1280, 1287 (9th Cir. 1977) (citations omitted). *Accord, Taubler v. Giraud*, 655 F.2d 991, 993 (9th Cir. 1981).

venient forum" and to prevent states "through their courts [from reaching] out beyond the limits imposed by them as co-equal sovereigns in a federal system." [69] The court ruled that the Oklahoma court's exercise of jurisdiction over out-of-state car dealers was improper.

The "minimum contacts" test outlined above is a standard that has been applied exclusively to cases in which a forum sought to exercise jurisdiction over non-resident *defendants*. The notions of residence and territoriality, which gave rise to the minimum contacts test to protect absent defendants, have no application to absent plaintiffs who already are protected by notice of a right to be heard and adequate representation.[70]

 The strict rules of personal jurisdiction governing most civil actions necessarily must yield when a lawsuit is brought that is representative in nature, particularly when such an action involves alleged misconduct that takes place in more than one state.[71]

 It has long been recognized that class actions may proceed, in fact often must proceed, in the absence of personal jurisdiction over all class members. In *Supreme Tribe of Ben-Hur v. Cauble*, 255 U.S. 356, 41 S.Ct. 338, 65 L.Ed. 673 (1921), the United States Supreme Court allowed a class action brought in federal court on behalf of persons who "resided in many different states of the Union," and held that the judgment rendered therein was binding on all members." [72] The court noted that the class action judgment was valid and binding despite the fact that the federal court did not have jurisdiction over all members of the class.

In *Hansberry v. Lee*, 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940) the court was even more explicit in its recognition of the special jurisdictional nature of the class suit:

It is a principle of general application in Anglo-American jurisprudence that one is not bound by a judgment *in personam* in a litigation in which he is not designated as a party or to which he has not been made a party by service of process . . . . To these general rules there is a recognized *exception* that to an extent not precisely defined by judicial opinion, the judgment on a 'class' or 'representative' suit, to which some members of the class are parties, may bind members of the class or those represented who were not made parties to it. (citations omitted.) [73]

The *deviation* from the jurisprudential maxim that "everyone is entitled to his day in court" has been recognized in the language and case law interpretation of Federal Rule 23. Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." The impracti-

---

**69.** *World-Wide Volkswagen v. Woodson*, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980).

**70.** Ross, Multistate Consumer Class Actions in Illinois, 57 Chi-Kent L.Rev. 397, 414 (1981).

**71.** Federal courts have long assumed jurisdiction over nationwide classes notwithstanding that a majority of plaintiffs were not within the jurisdiction of the district court. *See, e. g., United States v. Will*, 449 U.S. 200, 101 S.Ct. 471, 66 L.E.2d 392 (1980); *Califano v. Yamasaki*, 442 U.S. 682, 701–03, 99 S.Ct. 2545, 2558–59, 61 L.Ed.2d 176 (1979); *McClure v. Harris*, 503 F.Supp. 409, 415 (N.D.Cal.1980); *Philadelphia Elec. Co. v. Anaconda American Brass Co.*, 43 F.R.D. 452 (E.D.Pa.1968). This court recognizes that these cases involved representative plaintiffs who were seeking certification rather than resisting it, such that the issues were never raised. However, these nationwide class actions have been certified most often in 23(b)(1) and (b)(2) class suits where the unnamed class members would not have been entitled to opt-out or receive notice. As such, the mere recognition of the viability of class suits in these contexts seems to imply that adequate representation, and not presence, is the foundation of due process in the class suit.

**72.** 255 U.S. 356, 364, 41 S.Ct. 338, 341, 65 L.Ed. 673. *See also Hartford Life Insurance Co. v. Ibs*, 237 U.S. 662, 671–74, 35 S.Ct. 692, 695–96, 50 L.Ed. 1165 (1915).

**73.** 311 U.S. 32, 40–41, 61 S.Ct. 115, 117–118, 85 L.Ed. 22 (emphasis supplied). *Accord, Dosier v. Miami Valley Broadcasting Corp.*, 656 F.2d 1295, 1299 (9th Cir. 1981); *Calagaz v. Calhoon*, 309 F.2d 248, 254 (5th Cir. 1962); Maraist and Sharp, Federal Procedure's Troubled Marriage: Due Process and The Class Action, 49 Tex.L. Rev. 1 (1970).

cability standard encompasses not only cases with an unmanageably large number of plaintiffs but also preserves the old equity notion that joinder is impracticable or impossible when the court is unable to acquire jurisdiction over all class members.[74]

Similarly, the *jus tertii* nature of a class suit is exemplified in a 23(b)(1) or 23(b)(2) class action. In light of the fact that the (b)(1) or (b)(2) class is most cohesive in interest and that the issues determined in the class suit essentially are the same as to all class members, courts have held that due process does not require that unnamed plaintiffs be given a chance to opt out or receive notice of the action.[75] Rather due process requires only that class members in such courts be adequately represented. It is axiomatic, of course, that these rules are constitutionally permissible only because the remedies afforded by a class action are a sufficient alternative for the protection of the unnamed plaintiffs.[76]

Finally, in the analogous area of subject matter jurisdiction, it is well-recognized that a class suit brought in federal court upon diversity of citizenship, only requires that the citizenship of the named parties be considered.[77] Courts have reconciled due process requirements with the relaxation of rules governing subject matter jurisdiction by stressing the sheer necessity of such rules in order to retain the viability of the class action device.[78]

Many courts[79] and a host of commentators[80] have expressed doubts that the minimum contacts test should be extended to unnamed members of a plaintiffs' class. Imposing a requirement that all class members be within the court's jurisdiction would substantially negate the practical effects of the class action device. "[R]equiring personal jurisdiction over all of the class members would in effect destroy the class action concept since by definition there could be no 'absent' members."[81]

If in every case unnamed class members were lurking in the background waiting to challenge the action due to lack of jurisdiction, courts would rarely, if ever, certify classes involving large numbers of plain-

---

74. *See* 7 Wright, Miller & Kane § 1762 (1980 ed.); Donelan, Prerequisites to a Class Action Under New Rule 23, in The Class Action—A Symposium, 10 B.C. Ind. & Comp. L. Rev. 527, 531 (1969).

75. *Dosier v. Miami Valley Broadcasting Corp.*, 656 F.2d 1295, 1299 (9th Cir. 1981); *Robertson v. National Basketball Association*, 556 F.2d 682, 686 (2nd Cir. 1977); *Larionoff v. United States*, 533 F.2d 1167 (D.C.Cir.1976), aff'd, 431 U.S. 864, 97 S.Ct. 2150, 53 L.Ed.2d 48 (1977); A. Miller, Problem of Giving Notice in Class Actions, 58 F.R.D. 313, 315 (1973).

76. The reasons for the exceptions to the general due process rules are based on considerations of necessity, convenience, and practicality. 7 Wright, Miller & Kane § 1789 (1980 ed.).

77. *Snyder v. Harris*, 394 U.S. 332, 340, 89 S.Ct. 1053, 1058, 22 L.Ed.2d 319 (1969); *see also* cases cited in note 105 *infra*.

78. C. Wright, Law of Federal Courts 355 (3d ed. 1976) and cases cited therein. Similarly, for purposes of venue, only the residence of one named party need be considered. *Appleton Elec. Co. v. Advance-United Expressways*, 494 F.2d 126 (7th Cir. 1974); *Research Corp. v. Pfister Associated Growers, Inc.*, 301 F.Supp. 497 (N.D.Ill.1969).

79. *Schlosser v. Allis-Chalmers Corp.*, 86 Wis.2d 226, 271 N.W.2d 879 (1978), *Shutts v. Phillips Petroleum Co.*, 222 Kan. 527, 567 P.2d 1292 (1977), *cert. denied*, 434 U.S. 1068, 98 S.Ct. 1246, 55 L.Ed.2d 769 (1978). *Contra, Feldman v. Bates Mfg. Co.*, 143 N.J.Super. 84, 89–94, 362 A.2d 1177, 1179–82 (1976).

80. Ross, Multistate Consumer Class Actions in Illinois, 57 Chi-Kent L.Rev. 397 (1981), Comment, Multistate Plaintiff Class Actions: Jurisdiction and Certification, 92 Harv.L.Rev. 718 (1979); Comment, Toward a Policy-Based Theory of State Court Jurisdiction Over Class Actions, 56 Tex.L.Rev. 1033 (1978); Comment, In Personam Jurisdiction Over Nonresident Plaintiffs in Multistate Class Actions, 17 Washburn L.J. 382 (1978); Comment, Consumer Class Actions with a Multistate Class: A Problem of Jurisdiction, 25 Hastings, L.J. 1411 (1974); K. Forde, Class Actions, 8–27 (Ill. Inst. for CLE, 1979); 3B J. Moore, Federal Practice, ¶ 23.11[5] (2d ed. 1980); Restatement (Second) of Judgments § 26 (Tent. Draft No. 5, March 10, 1978).

81. Parsons and Starr, Environmental Litigation and Defendant Class Actions: The Unrealized Viability of Rule 23, 4 Envir. L.Q. 881, 888–89 (1975). *See also In re Gap Securities Litigation*, 79 F.R.D. 283, 291 (N.D.Cal.1978).

tiffs. Such a result was never intended by either the early courts of equity or the drafters of modern Rule 23.

The tension between the jurisdictional rules identified above and rules governing class actions is resolved, at least with respect to plaintiffs' classes,[82] by requiring that designated representatives adequately represent the interest of the class.[83] The rule is plain, therefore, that if members of a plaintiffs' class are adequately represented in a (b)(1) or (b)(2) class, a court may exercise personal jurisdiction if it has jurisdiction over the representative plaintiffs.[84]

Assertion of jurisdiction in this case is premised on an even more fundamental foundation. The *sine qua non* of all exercises of personal jurisdiction is that the court's assertion of power be reasonable and fair.[85] Fairness is the doctrinal axis upon which all questions of due process and jurisdictional power turn.[86]

In evaluating the assertion of jurisdiction in a case involving multiple plaintiffs injured by the identical conduct of defendants, the primary concern is whether the exercise of such power is fair and reasonable to the parties before the court. Courts have identified several factors that should be considered in assessing the reasonableness of subjecting an unwilling *defendant* to jurisdiction.[87] This court will consider these factors in turn.

1. *The extent of the party's purposeful integration into the forum state.* [88]

In *Hanson v. Denckla*, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958) the Supreme Court, speaking in the context of an unwilling defendant, stated that the exercise of jurisdiction requires "that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." [89]

As previously discussed, this factor, which is only one of many for the court to consider, does not apply to exercise of jurisdic-

**82.** There is, of course, a theoretical distinction between plaintiffs and defendants in a class situation. The binding effect of a judgment on defendant is coercive in nature, necessarily denying defendant rights recognized by the Constitution and deemed protected by the due process clause. On the other hand, the binding effect of a judgment entered against a plaintiff class is, at worst, *res judicata* and denies an individual member of the class the opportunity to relitigate an issue previously tried in a class suit in which he was adequately represented. *See* Developments in the Law—Class Actions, 89 Harv.L.Rev. 1318, 1404 (1976).

**83.** Parsons and Starr, Environmental Litigation and Defendant Class Actions: The Unrealized Viability of Rule 23, 4 Envir. L.Q. 881, 888–89 (1975); Note, Defendant Class Actions, 91 Harv.L.Rev. 630, 638 (1978); Note, Class Actions—Adequacy of Representation, 44 Notre Dame L.Rev. 151 (1968).

**84.** *See Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950).

**85.** This court is not unmindful of the visceral reaction of many plaintiffs that this court's assertion of jurisdiction over cases filed outside California is an infringement of their rights. Actually, however, the target of plaintiffs' "slings and arrows" is not the exercise of jurisdictional power but rather the class action device itself which embodies the well-established rule that a representative action constitutes an exception to the fundamental principle of our procedural law that each person is free to determine whether, when and how to enforce his substantive rights. Weinstein, Revision of Procedure: Some Problems in Class Actions, 9 Buff.L.Rev. 433, 434 (1960).

**86.** *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945); *Insurance Co. of North America v. Marina Salina Cruz*, 649 F.2d 1266 (9th Cir. 1981).

**87.** The court repeats its earlier admonition that most jurisdictional factors have not been analyzed with respect to an unwilling plaintiff party. *See* note 82 *supra* for a discussion of the general inapplicability of certain analyzed criteria when the plaintiff is the party challenging the court's jurisdiction.

**88.** *See World-Wide Volkswagen v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980); *Insurance Co. of North America v. Marina Salina Cruz*, 649 F.2d 1266, 1270 (9th Cir. 1981); *Rocke v. Canadian Automobile Sport Club*, 660 F.2d 395 (9th Cir. 1981).

**89.** 375 U.S. 235, 253, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283.

tion over unnamed plaintiff parties in the class action context.[90] Rather, the "purposeful availment" of adequate representatives is sufficient.

### 2. The burden of defending in the forum state.

In the present class action suit, there is virtually no burden placed on out-of-state class members in the prosecution of this suit. Local class representatives will appear as witnesses and local class counsel will bear the initial expense of litigation. Any requirement that non-resident class members file affidavits in their home-state for use in the class suit in California presents a minimal burden in light of the substantial savings of time and expense afforded all parties.

### 3. Conflicts with sovereignty of other states.

It is now well-recognized that "the Due Process Clause, acting as an instrument of interstate federalism, may sometimes act to divest the State of its power to render a valid judgment."[91] The reasonableness of jurisdiction under this standard depends upon the seriousness of the potential affront to the sovereignty of a foreign state.[92]

In the present case, there is a limited incursion into the sovereignty of other states with respect to the determination of the amount in which the corporate defendant should be punished. This court does *not* purport to deprive other states of the power to try causes in their own courts. In fact, the single determination of the punitive damages issues may well protect the interests of non-resident class members who might otherwise be deprived of the opportunity to collect additional sums as part of an award of exemplary damages.[93]

In acknowledging the viability of multistate class actions and the special due process rules applicable thereto, the United States Supreme Court has recognized that the sovereignty aspect of our federal system yields, to some extent, to the practical necessities of the representative suit. Therefore, the interests underlying our constitutional federalism do not apply with equal force to a federal class action.

### 4. The forum state's interest in adjudicating the dispute.[94]

The interest of the forum state in this case is significant. A significant percentage of the parties allegedly injured by the defendant's product are California residents.[95] This state has a significant interest in promoting safe products and in protecting its own citizens.[96] Finally, this state has an interest in seeing that its residents not be deprived of a potential punitive damage recovery due to earlier awards made in other forums.

### 5. The parties' interest in convenient and effective relief.

In analyzing the power of a court to assert jurisdiction, an important, though by no means determinative, factor to consider is the parties' interest in obtaining convenient and effective relief, particularly when these interests are not adequately preserved by the plaintiff's personal choice of forum.[97]

90. *See* notes 79–84 *supra.*

91. *World-Wide Volkswagen v. Woodson*, 444 U.S. 286, 294, 100 S.Ct. 559, 565, 62 L.Ed.2d 490 (1980).

92. *Insurance Co. of North America v. Marina Salina Cruz*, 649 F.2d 1266, 1272 (9th Cir. 1981).

93. *See* notes 37–39 *supra.*

94. *World-Wide Volkswagen v. Woodson*, 444 U.S. 286, 292, 100 S.Ct. 556, 564, 62 L.Ed.2d 490 (1980).

95. From cases filed to date, it appears that 15–20% of all potential plaintiffs reside in the state.

96. *See* discussion *infra* regarding the choice of laws question presented in this lawsuit. Notes 162–63 *infra. See also Taubler v. Giraud*, 655 F.2d 991 (9th Cir. 1981).

97. *World-Wide Volkswagen v. Woodson*, 441 U.S. 286, 292, 100 S.Ct. 556, 564, 62 L.Ed.2d 490 (1980); *Kulko v. Superior Court*, 436 U.S. 84, 92, 98 S.Ct. 1690, 1696, 56 L.Ed.2d 132 (1978).

In the present case, both plaintiffs and the defendant stand to gain by having one binding determination of the punitive damage question. Certainly later plaintiffs are able to avoid the inevitable dismissal of their punitive damage claims. Similarly, the defendant is able to put a stop to repetitive litigation that runs the risk of punishing it over and over again for the same conduct.

6. *The interstate judicial system's interest in obtaining the most efficient resolution of controversies.*

In *World-Wide Volkswagen v. Woodson*, 444 U.S. 286, 292, 100 S.Ct. 556, 564, 62 L.Ed.2d 490 (1980), the Supreme Court recognized that the exercise of jurisdiction may turn in some cases on the need for interstate cooperation in resolving controversies and the "shared interests of the several States in furthering fundamental substantive social policies." [98] The Court expressly recognized, therefore, that in some situations fairness to parties opposing jurisdiction must be evaluated in light of factors such as judicial efficiency and interstate cooperation.

In the present case, there is certainly a need for rational coordination of an otherwise unmanageable group of cases involving an identical issue, i. e., the amount of punitive damages the defendant should be required to pay for its alleged misconduct. All states in which punitive damages are allowed have a shared interest in seeing that the alleged misconduct is punished.

The "minimum contacts" test was never intended to be a rigid formulation demanding blind conformity. Rather, it varies with the measure of values affected, the costs inflicted by failure to exercise jurisdiction and the facts of each case before the court. [99] The present case involves both the class action exceptions to normal jurisdictional requirements and a situation where the ultimate fairness to all parties concerned is a single determination of an issue with national implication. As such, the court has properly exercised jurisdiction over the members of this class within the parameters of due process and fundamental fairness.

## Subject Matter Jurisdiction

Jurisdiction over the subject matter is critical in the federal court system because all federal courts are courts of limited jurisdiction. [100] As such, this court is under an independent obligation to examine the basis of its jurisdiction over the subject matter in order to avoid an unconstitutional invasion of the powers reserved to the states. [101]

A class action must have an independent basis of jurisdiction as Rule 23 cannot be interpreted to extend in any way the subject matter jurisdiction of the federal courts. [102] The present case satisfies this requirement because it comes within this court's diversity jurisdiction. [103]

This court has examined two possible objections to the exercise of subject matter jurisdiction in this action. First, it might be argued that this case does not satisfy the so-called "complete diversity" requirement [104] because certain unnamed

---

**98.** 444 U.S. 286, 292, 100 S.Ct. 556, 564, 62 L.Ed.2d 490, citing *Kulko v. Superior Court*, 436 U.S. 84, 98 S.Ct. 1690, 56 L.Ed.2d 132 (1978).

**99.** *See generally* Carrington and Rash, Substantive Interests and the Jurisdiction of the State Courts, 66 Mich.L.Rev. 227 (1967).

**100.** *See* C. Wright, Law of Federal Courts 17–18 (3d ed. 1976); Green, Basic Civil Procedure 13 (2d ed. 1978).

**101.** 13 Wright, Miller & Cooper, Federal Practice & Procedure, § 3522 (1980 ed.); C. Wright, Law of Federal Courts 17 (3d ed. 1976).

**102.** Fed.R.Civ.P. 82. While no parties to this litigation have challenged the court's subject matter jurisdiction over the parties within this class, this court is obliged to notice want of jurisdiction on its own motion. *Kenosha v. Bruno*, 412 U.S. 507, 511, 93 S.Ct. 2222, 2225, 37 L.Ed.2d 109 (1973).

**103.** *See* 28 U.S.C. § 1332.

**104.** In *Strawbridge v. Curtis*, 7 U.S. (3 Branch) 267, 2 L.Ed. 435 (1806) the rule was established that where there are multiple plaintiffs or defendants, if any plaintiff is a citizen of the same state as any defendant, the diversity is not complete and no jurisdiction attaches.

class members reside in the same state as the defendant. This argument, however, ignores the rule that in a class suit, diversity is determined only by the citizenship of the named representatives.[105] If a contrary rule applied, class actions would be unworkable due to the inability of the court to identify the citizenship of all unnamed class members.

■ In the present case all named plaintiffs, while representing the gamut of injuries and claims, are residents of states diverse from that of the defendant. Accordingly, this court has jurisdiction on the basis of diversity.

Second, the jurisdiction of this court might be attacked on the argument that each plaintiff in the class does not state a claim in excess of the $10,000 jurisdictional amount.[106] This argument is premised on the United States Supreme Court's decision requiring that each class member, named or unnamed, must meet the amount in controversy requirement.[107]

In determining whether or not all the plaintiffs satisfy the jurisdictional amount

requirement, this court is guided by the rule that the "sum claimed by the plaintiff controls if the claim is apparently made in good faith."[108] Furthermore, "it must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal."[109] This rule applies to a plaintiff's claim for punitive damages.[110]

In the face of plaintiffs' allegations concerning punitive damages,[111] this court cannot say to a legal certainty that the total award will not yield more than $10,000 to each successful claimant.[112] If a contrary result appears, the court can dismiss the punitive damage claims as to those parties who are shown to be unable to meet the jurisdictional requirement.[113]

■ The claims before this court for an award of punitive damages also satisfy the jurisdictional amount requirement under an exception to the rule against aggregation of claims by multiple parties. The settled rule is that "when several plaintiffs unite to enforce a single title or right in which they have a common and undivided interest, it is

---

105. *Snyder v. Harris,* 394 U.S. 332, 340, 89 S.Ct. 1053, 1058, 22 L.Ed.2d 319 (1969); *Supreme Tribe of Ben-Hur v. Cauble,* 255 U.S. 356, 363, 41 S.Ct. 338, 341, 65 L.Ed. 673 (1921); *Friedman v. Meyers,* 482 F.2d 435 (2d Cir. 1973); C. Wright, Law of Federal Courts 355 (3d ed. 1976).

106. *See* 28 U.S.C. § 1332.

107. *Snyder v. Harris,* 394 U.S. 332, 89 S.Ct. 1053, 22 L.Ed.2d 319 (1969) (aggregation of separate claims will not satisfy jurisdictional amount); *Zahn v. International Paper Co.,* 414 U.S. 291, 301, 94 S.Ct. 505, 511, 38 L.Ed.2d 511 (1973) ("[e]ach plaintiff in Rule 23(b)(3) class action must satisfy the jurisdictional amount....").

After *Zahn,* it is uncertain whether the rules stated above apply with equal force to Rule 23(b)(1) and 23(b)(2) class actions. Prior to the 1966 Amendment to Rule 23, the aggregation of claims always was permitted in the "true" class suit because like a 23(b)(1)(B) class, the plaintiffs' rights were joint, common and derivative. *See e. g., Gibbs v. Buck,* 307 U.S. 66, 59 S.Ct. 725, 83 L.Ed. 1111 (1939); *Brotherhood of R.R. Trainmen v. Templeton,* 181 F.2d 527 (8th Cir.) *cert. denied,* 340 U.S. 823, 71 S.Ct. 57, 95 L.Ed. 605 (1950). However, in light of the

jurisdictional amount in this case, this court need not address that issue at this time.

108. *St. Paul Mercury Indemnity Co. v. Red Cab Co.,* 303 U.S. 283, 288, 58 S.Ct. 586, 590, 82 L.Ed. 845 (1938). *Accord, City of Inglewood v. City of Los Angeles,* 451 F.2d 948, 952–53 (9th Cir. 1971).

109. *Id.* at 952.

110. *Bell v. Preferred Life Assurance Society,* 320 U.S. 238, 64 S.Ct. 5, 88 L.Ed. 15 (1943).

111. *See* note 4 *supra.*

112. Even assuming the success of all 1800 claimants at their individual trials, a $10,000 punitive damage award to each only would require a total fund of $18,000,000. Without passing on the merits of the arguments of the case, this court does not find such an award to be beyond the realm of reasonable possibility. Regardless, it does not appear to a "legal certainty" that plaintiffs cannot recover the amount which has been demanded.

113. For a similar treatment of the jurisdictional amount requirement in a class action, *see Payton v. Abbott Labs,* 83 F.R.D. 382, 395 (D.Mass. 1979).

enough if their interests collectively equal the jurisdictional amount."[114]

The present plaintiffs are seeking to vindicate a common integrated interest in a punitive damage award against the A. H. Robins Company. In *Berman v. Narragansett Racing Association*, 414 F.2d 311 (1st Cir. 1969), *cert. denied*, 396 U.S. 1037, 90 S.Ct. 682, 24 L.Ed.2d 681, the court confronted a virtually identical set of facts. In *Berman*, the plaintiffs, as representatives of fellow race horse owners, brought a class action against the owners of a racetrack for their alleged failure to pay money alleged to be due plaintiffs under annual purse agreements. The object of the class action was to determine the validity of a fund for later distribution to individual horse owners based on an as yet undetermined recovery formula.[115]

The district court in *Berman* dismissed the action for lack of subject matter jurisdiction and the First Circuit reversed. The court stated that the interest of the group of pursewinners in the asserted right was common and undivided, and as such, the amount of the *fund*, and not each plaintiff's individual interest therein, would constitute the "amount in controversy."[116] The court held that the plaintiffs' claims constituted, in their totality, an integrated right against the defendant, notwithstanding the fact that each class member had an undivided interest in the distribution of the fund.[117]

Similarly, the plaintiffs in the present case have a common and undivided interest in the recovery of punitive damages against the corporate defendant. While no individual plaintiff has a "right to an award of exemplary damages,[118] all plaintiffs have a collective interest in the creation of a fund sufficient to punish and deter any alleged misconduct on the part of the defendant. Accordingly, the court must look to the amount of the potential fund, and not the individual awards, for the determination of the amount in controversy. Accordingly, the court has subject matter jurisdiction.

*M.D.L.—Jurisdiction Issue*

The plaintiff's counsel argues that this court is without jurisdiction to certify a class in these actions because a small number of cases still are pending in the District of Kansas, where they had been transferred by the Judicial Panel on Multidistrict Litigation ("M.D.L.").[119] This court disagrees and holds that prohibitions on the exercise of jurisdiction over cases at multidistrict litigation do not apply to actions already remanded from such proceedings.

The resolution of the jurisdictional question raised by the plaintiff's liaison counsel at M.D.L. requires a brief review of the relevant proceedings before the Judicial Panel on Multidistrict Litigation ("Panel"). In 1975, the Panel, acting pursuant to 28 U.S.C. § 1407,[120] transferred all actions in-

114. *Pinel v. Pinel*, 240 U.S. 594, 596, 36 S.Ct. 416, 417, 60 L.Ed. 817 (1916); *see also* C. Wright, Law of Federal Courts 139 n.8 and cases cited therein (3d ed. 1976).

115. 414 F.2d 311, 314–15.

116. *Id.* at 315.

117. The *Berman* court also noted that one factor of considerable importance in determining if the plaintiffs' interests are aggregable is whether the defendant has an interest in how the funds will be apportioned if plaintiffs prevail. *Id.* at 316. In the instant case, as in *Berman*, the distribution formula that is adopted will not affect the defendant's overall liability. Accordingly, application of this factor points to the finding that the interests of the plaintiffs' are common and undivided notwith-

standing that their "interest are separable among themselves." *Id.*, at 316.

118. *See* note 41 *supra* and note 156 *infra*.

119. *See In re A. H. Robins Co., Inc., "Dalkon Shield" IUD Products Liability Litigation*, 406 F.Supp. 540 (Jud.Pan.Mult.Lit.1975).

120. 28 U.S.C. § 1407(a) provides: "(a) When civil actions involving one or more common questions of fact are pending in different districts, such actions may be transferred to any district for coordinated or consolidated pretrial proceedings. Such transfers shall be made by the judicial panel on multidistrict litigation authorized by this section upon its determination that transfers for such proceedings will be for the convenience of parties and witnesses and will promote the just and efficient conduct of

volving claims for damages arising out of the use of the Dalkon Shield intrauterine device to the District of Kansas with the Honorable Frank G. Theis presiding.[121]

The parties to the consolidated litigation conducted extensive pretrial discovery which was made available nationally to all counsel. During the time pretrial discovery was conducted, the litigation before Judge Theis involved approximately one thousand actions.

After almost four years of consolidated discovery, Judge Theis reported to the Panel that all pretrial proceedings of a general nature had been concluded and that the objectives of centralized pretrial proceedings under Section 1407 had been accomplished.[122] Accordingly, Judge Theis entered his pretrial order on November 28, 1977 and recommended that the Panel begin remanding actions to their respective transferor courts.[123]

Despite the fact that all common discovery was completed in the transferee dis-trict,[124] the transfer of the tag-along actions[125] continued for the sole purpose of obtaining the benefits and restrictions deriving from the pretrial orders entered by the transferee judge.[126] Recognizing the obvious procedural complications caused by this practice, the Panel began vacating its conditional transfer orders.[127] In so doing, the Panel expressly noted that transfer of actions from the Northern District of California particularly was inappropriate because continuing transfer for multidistrict litigation would frustrate the local consolidation of cases for all pretrial proceedings.[128]

Finally, in January of this year, the Panel vacated several more orders transferring actions for multidistrict treatment and stated that transfer "would not serve the conveniences of the parties and witnesses or promote the just and efficient conduct of the Dalkon Shield litigation."[129] The Panel ruled that as of the date of its opinion, it

---

such actions. Each action so transferred shall be remanded by the panel at or before the conclusion of such pretrial proceedings to the district from which it was transferred unless it shall have been previously terminated: *Provided, however,* That the panel may separate any claim, cross-claim, counter-claim, or third-party claim and remand any of such claims before the remainder of the action is remanded." (Emphasis in original).

121. See In re A. H. Robins Co., Inc., "Dalkon Shield" IUD Products Liability Litigation, 406 F.Supp. 540, (Jud.Pan.Mult.Lit.1975); In re A. H. Robins Co., Inc., "Dalkon Shield" IUD Products Liability Litigation, 419 F.Supp. 710 (Jud.Pan.Mult.Lit.1976); In re A. H. Robins Co., Inc., "Dalkon Shield" IUD Products Liability Litigation, 438 F.Supp. 942 (Jud.Pan.Mult.Lit. 1977).

122. See In re A. H. Robins Co., Inc., "Dalkon Shield" IUD Products Liability Litigation, Docket No. 211 (D.Kan.1977) (unpublished order); In re A. H. Robins Co., Inc., "Dalkon Shield" IUD Products Liability Litigation, 453 F.Supp. 108, 110 (Jud.Pan.Mult.Lit.1978).

123. In re A. H. Robins Co., Inc., "Dalkon Shield" IUD Products Liability Litigation, Docket No. 211 (D.Kan.1977) (unpublished order).

124. In re A. H. Robins Co., Inc. "Dalkon Shield" IUD Products Liability Litigation, 453 F.Supp. 108, 110 (Jud.Pan.Mult.Lit.1978).

125. A "tag-along" action refers to those cases transferred by the Panel to be joined with cases previously ordered to be transferred. Rule 1 R.P.J.P.M.L., 78 F.R.D. 562 (1978); See also Weigel, The Judicial Panel on Multidistrict Litigation, Transferor Courts and Transferee Courts, 78 F.R.D. 575, 579 (1978).

126. In re A. H. Robins Co., Inc. "Dalkon Shield" IUD Products Liability Litigation, Docket No. 211 (Jud.Pan.Mult.Lit. October 7, 1980) (unpublished order).

127. See, e. g., In re A. H. Robins Co., Inc., "Dalkon Shield" IUD Products Liability Litigation, 505 F.Supp. 221 (Jud.Pan.Mult.Lit.1981); In re A. H. Robins Co., Inc., "Dalkon Shield" IUD Products Liability Litigation, Docket No. 211 (Jud.Pan.Mult.Lit. October 7, 1980) (unpublished order); In re A. H. Robins Co., Inc., "Dalkon Shield" IUD Products Liability Litigation, 453 F.Supp. 108 (Jud.Pan.Mult.Lit.1978).

128. In re A. H. Robins Co., Inc., "Dalkon Shield" IUD Products Liability Litigation, Docket No. 211, (Jud.Pan.Mult.Lit. October 7, 1980) (unpublished order).

129. In re A. H. Robins Co., Inc., "Dalkon Shield" IUD Products Liability Litigation, 505 F.Supp. 221, 223 (Jud.Pan.Mult.Lit.1981).

would no longer issue conditional transfer orders.[130]

At the time of this court's order conditionally certifying a class action,[131] all discovery and motion procedures in the multidistrict litigation had been concluded and only fifty-four cases remained at the District of Kansas awaiting remand. At that time, however, Judge Theis, who retained jurisdiction over the fifty-four cases, had under submission a motion to reopen discovery for limited additional fact-finding pending a decision by the Panel on the defendant's motion to remand all cases. On October 9, 1981, nearly four months after this court certified a class action, the Panel deferred to Judge Theis's intention to reopen discovery in the cases remaining before him and denied the request to remand.[132]

Plaintiff's counsel argues that this court has no jurisdiction to certify a nationwide class action in cases previously transferred for multidistrict litigation. The plaintiff relies exclusively on *In re Plumbing Fixture Cases*, 298 F.Supp. 484 (Jud.Pan.Mult.Lit. 1968).

In the *Plumbing Fixture* case, the Panel transferred nine antitrust actions involving plumbing fixtures to the Eastern District of Pennsylvania. In answer to a request by the parties to one of the actions filed as a class suit, the Panel rejected the argument that it could transfer the cases before it but reserve the class action issues for determination by the transferor court. The Panel reasoned that it had neither the power nor the disposition to limit the transferee judge's authority to rule on pretrial motions.[133] The court established the unchallenged rule that once an action has been transferred for multidistrict litigation, the transferor court in that action is without jurisdiction to issue any orders, which includes a class certification order, until the case is remanded.[134]

The court in *Plumbing Fixture* premised its result on two legal grounds. First, the Panel noted that the purpose of Section 1407 was to eliminate the potential for conflicting pretrial rulings, and therefore its clear intent was to "invest the transferee court with the exclusive power, after transfer, to make the pretrial determination of the class questions."[135] The court stated that this rule was designed to insure speedy and economical coordination and would apply to an action from the time it was transferred *until* the time it was remanded.[136]

Second, the Panel in its *Plumbing Fixture* opinion recognized the jurisprudential maxim that "[t]wo courts of exclusive different jurisdictions, or venues, cannot exercise control over the same single claim for relief at the same time."[137] Accordingly, the Panel concluded that the class action determination was left to the court with jurisdiction over the case.

Plainly, the *Plumbing Fixture* rule does not deprive this court of jurisdiction to issue a class action ruling. This court fully was aware of the necessary comity required by Section 1407 and waited until the remand of cases before certifying a class action. The *Plumbing Fixture* case itself made it crystal clear that the transferor court reacquires the power to make a class

---

130. *In re A. H. Robins Co., Inc., "Dalkon Shield" IUD Products Liability Litigation*, 505 F.Supp. 221, 223, n. 5 (Jud.Pan.Mult.Lit.1981).

131. *In re A. H. Robins Co., Inc., "Dalkon Shield" IUD Products Liability Litigation*, 521 F.Supp. 1188 (N.D.Cal.1981).

132. *In re A. H. Robins Co., Inc., "Dalkon Shield" IUD Products Liability Litigation*, (Jud. Pan.Mult.Lit. October 9, 1981) (unpublished order).

133. *In re Plumbing Fixture Cases*, 298 F.Supp. 484, 489–94; *see also* Wright, Miller & Kane, Federal Practice & Procedure, § 3862, p. 328 (1980 ed.).

134. *In re Plumbing Fixture Cases*, 298 F.Supp. 484, 493 (Jud.Pan.Mult.Lit.1968).

135. *Id.* at 496.

136. *Id.*

137. *Id.* at 495.

action ruling once a case is remanded to it.[138]

 This court properly exercised its jurisdiction to certify a class based on cases pending before it. At the time of this court's initial certification order, more than 150 cases were pending in the Northern District of California and this court had exclusive jurisdiction over these cases. In fact, when these cases were remanded, the Panel stated that it was neither empowered nor inclined to direct, or suggest to, a transferor judge how he or she should conduct further proceedings.[139] The Panel stated:

"The questions regarding continuing pretrial coordination raised by some parties to this litigation, ... will be, upon remand, within the province of the respective transferor courts." [140]

Application of the *Plumbing Fixture* holding to the facts of this case would stand the rule on its head. In that case, the court acknowledged the usefulness of a single multidistrict class action ruling in order to eliminate conflicting orders and provide for economical coordination of pretrial proceedings.[141] In this case, a nationwide determination of the single issue of punitive damages will result in both a major saving of time and expense and a single determination where otherwise conflicting rulings would injure both plaintiffs and the defendant. The application of an exclusive jurisdiction rule to multidistrict proceedings that are completed would result in the frustration of the very principle which such consolidation was designed to advance.[142] On the contrary, it is clear that the *Plumbing Fixture* rule does not govern cases which already have been remanded from multidistrict litigation.[143]

The fact that some fifty-four cases remained before Judge Theis when this court certified a nationwide class action does not change the result in this case.[144] It is admitted by all parties that those cases remained in the District of Kansas only to acquire the benefits of theretofore completed discovery. The Panel had long since recognized that alternative efforts at consolidation of cases and saving of judicial were vested exclusively in the transferor courts.[145] The Panel did not vacate its prior decision in which it decided that no new cases would be transferred to the transferee district.[146]

**138.** The Panel acknowledged that the process of certifying a class action may continue after the pretrial proceedings before the multidistrict transferee court are completed. It stated: "This leaves the transferor court some power and discretion before and *after* remand." *Id.* at 494.

**139.** *In re A. H. Robins Co., Inc., "Dalkon Shield" IUD Products Liability Litigation,* 453 F.Supp. 108, 110 (Jud.Pan.Mult.Lit.1978).

**140.** *Id.*

**141.** *In re Plumbing Fixture Cases,* 298 F.Supp. 484, 493 (Jud.Pan.Mult.Lit.1968); *see also* Wright, Miller & Cooper, Federal Practice & Procedure, § 3866, p. 376 (1980 ed.); Cooney, The Experience of Transferee Courts Under the Multidistrict Litigation Act, 39 U.Chi.L.Rev. 588, 603–07 (1972); *In re Corrugated Container Antitrust Litigation,* 662 F.2d 875 [1981–82 Trade Cases ¶ 74,175, 74,178] (D.C.Cir.1981).

**142.** The presiding judge at the multidistrict litigation, Judge Theis, never was presented with any requests for class action determinations and did not raise that question *sua sponte.* However, Judge Theis was apprised of this court's certification order and was provided a copy of the court's certification opinion when it was issued.

**143.** *See In re Aircrash Near Duarte, California on June 6, 1971,* 357 F.Supp. 1013, 1015 (C.D. Cal.1973); *Allegheny Airlines Inc. v. LeMay,* 448 F.2d 1341 (6th Cir.) *cert. denied,* 404 U.S. 1001, 92 S.Ct. 565, 30 L.Ed.2d 553 (1971).

**144.** To the extent that this court does not have jurisdiction over the cases remaining before Judge Theis, this court excludes them from the coverage of this class. However, it appears that the discovery necessary to update the prior information may be completed by the time this case goes to trial.

**145.** *In re A. H. Robins Co., Inc., "Dalkon Shield" IUD Products Liability Litigation,* 505 F.Supp. 221, 223 (1981).

**146.** It is of course true that the mere pendency of a motion before the Panel of a motion to transfer a case does not suspend the proceedings in the transferor court. R.P.J.M.L. Rule 16; Wright, Miller & Cooper, Federal Practice & Procedure, § 3866 p. 377 (1980 ed.).

The decision to certify an action as a class suit is within the sound discretion of the district court.[147] Absent any clear jurisdictional barriers, the exercise of this power is not limited by numbers or geographical region.[148] Therefore, this court's order does not conflict impermissibly with the jurisdiction of the transferee court in the multidistrict litigation.

*Choice of Law as to Punitive Damages*

Plaintiff's counsel argues that the issue of punitive damages is not appropriate for nationwide treatment because the standards governing their award vary from state to state.[149] This court disagrees and holds that this lawsuit involves a sufficiently common question of law so as to render a class action manageable notwithstanding variations in state punitive damages laws.

Courts have recognized that a choice of law problem may involve the application of so many states' laws that a class action is impossible.[150] In the present case, however, this court is capable of identifying and *accommodating* the interests of other states with a flexible approach to the trial of this lawsuit.[151]

Since the jurisdiction of this court is based on diversity of citizenship, the court is bound to apply California law, including its choice of law rules.[152] The court must first determine, however, whether this case involves a "real" or "true" conflict between the laws sought to be applied.[153]

A "true" or "real" conflict, as opposed to an "apparent" conflict, exists only when more than one state has a legitimate interest in applying its policy, which differs from that of the forum state.[154] At this point, the court is unable to discern a true conflict between the general policies underlying the various state rules regarding the award of punitive damages.

While many states have adopted varying standards governing the proper amount of the punitive award and different procedures by which such an amount is determined, the policies underlying such awards do not vary from state to state.

Punitive damages, especially as awarded in the class context, are not compensation for injuries. "Instead they are private fines levied by civil juries to punish reprehensible conduct and to deter its future occurrence."[155] Furthermore, these dam-

147. *Price v. Lucky Stores, Inc.*, 501 F.2d 1177, 1179 (9th Cir. 1974).

148. *See* note 71 *supra*.

149. *See* Bradley Post's Letter to the Court, June 17, 1981; Brief supporting Lead Counsel's Motion to Vacate, filed August 5, 1981 by the Oregon law firm, Johnson, Harrang & Swenson.

150. *See, e. g., Payton v. Abbott Labs*, 83 F.R.D. 382, 386 n.1 (D.Mass.1979)(Court indicated that a multistate class action would involve uncommon legal questions and inadequate class representatives). In fact, the existence of such a problem caused this court to limit class certification on the liability issue to the state of California.

151. *See, e. g., In re Air Crash Disaster Near Chicago, Illinois on May 25, 1979*, 644 F.2d 594 (7th Cir. 1981).

152. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Strassberg v. New England Mutual Life Ins. Co.*, 575 F.2d 1262 (9th Cir. 1978).

153. *See* Currie, The Disinterested Third State, 28 L. & Contemp. Probl. 754, 757–58 (1963). While the use of the term "true" conflict refers to Professor Currie's government interest analysis, the use of the term herein is meant only to refer to the threshold issue in all choice of law problems, *i. e.*, whether a "real" conflict actually exists.

154. *See generally*, Kay, The Use of Comparative Impairment to Resolve Conflicts: An Evaluation of the California Experience, 68 Cal.L. Rev. 577 (1980).

155. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 350, 94 S.Ct. 2997, 3012, 41 L.Ed.2d 789 (1974); *accord, International Brotherhood of Electrical Workers v. Foust*, 442 U.S. 42, 48, 99 S.Ct. 2121, 2126, 60 L.Ed.2d 698 (1979). In these two cases, the Supreme Court established national rules for recovery of exemplary damages and impliedly recognized that punitive damages represent, for the most part, a unitary concept. *See also Newport v. Fact Concerts, Inc.*, —— U.S. ——, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981).

ages are not given as of right in any state, but instead represent an amount necessary to punish and deter the defendant.[156]

This case does not involve the classic conflicts issue where one state allows recovery and the other does not.[157] On the contrary, the governmental interest in seeing this defendant punished for causing injury to a resident plaintiff is shared by all states permitting an award of punitive damages.[158]

Assuming the briefs filed before the court on the choice of law issue reflect some conflicting interests in the method by which punitive damages should be awarded in this litigation, the application of California's choice of law rule does not point to the application of another state's law.

California no longer applies a mechanical test, but rather employs the "governmental interest analysis."[159] The resolution of conflicts under this test requires an examination of the relevant interests of the implicated states. Generally, California law will be applied unless California and the foreign state each have compelling interests in having their law applied.[160]

Assuming, arguendo, a conflict in governmental interests in assessing punitive damages, a California court would determine "which state's interests would be more impaired if its policy were subordinated to the policy of the other state."[161] This comparative impairment theory requires that the court determine the relative commitment by each interested state to the law involved.

California has a strong interest in allowing punitive damages as evidenced by its "expansive" and liberal rules governing the award of punitive damages.[162] Moreover, the state's Supreme Court recently affirmed California's intense commitment to protecting consumers from injuries caused by defective drugs and medical devices.[163] This policy, which is noticeably progressive in nature, further supports the notion that California has a very strong interest in seeing that the manufacturer of a defective product be severely punished.

To this point, the court has not located any other state with as strong an interest in awarding punitive damages in the product liability context. Therefore, at this time, it appears that California's liberal punitive damages law would be the most impaired by application of another state's law.

If it later appears that there is a conflict between various states' interests in applying formulae for calculating the amount of

---

**156.** Dobbs, Law of Remedies 204 (1973); *Brewer v. Second Baptist Church*, 32 Cal.2d 791, 800–01, 197 P.2d 713 (1948).

**157.** *See, e. g., In re Air Crash Disaster Near Chicago, Illinois on May 25, 1979*, 644 F.2d 594 (7th Cir. 1981); *Reyno v. Piper Aircraft Co.*, 630 F.2d 149 (3d Cir. 1980), *cert. granted*, 450 U.S. 909, 101 S.Ct. 1346, 67 L.Ed.2d 333 (1981).

**158.** To the extent that a small number of states do not permit recovery of punitive damages, the individuals who bring suit there are not included as members of this class. The class herein is defined as all those who have valid claims against the defendant for punitive damages.

**159.** *S.A. Empresa De Viacao Aerea Rio Grandense v. Boeing Co.*, 641 F.2d 746, 749 (9th Cir. 1981); *Reich v. Purcell*, 67 Cal.2d 551, 432 P.2d 727, 63 Cal.Rptr. 31 (1967).

**160.** *Strassberg v. New England Mutual Life Insurance Co.*, 575 F.2d 1262, 1263–64 (9th Cir. 1977).

**161.** *Offshore Rental Co. v. Continental Oil Co.*, 22 Cal.3d 157, 165–66, 583 P.2d 721, 726, 148 Cal.Rptr. 867, 872 (1978).

**162.** *Rosener v. Sears Roebuck & Co.*, 110 Cal. App.3d 740, 758–62, 168 Cal.Rptr. 237, 248–50 (1980), *appeal dismissed*, 450 U.S. 1051, 101 S.Ct. 1772, 68 L.Ed.2d 247 (1981)(Elkington, J., concurring). Putz and Astiz, Punitive Damage Claims of Class Members Who Opt Out: Should They Survive? —— U.S.F. —— (1981). California generally lists the requirement that there be a reasonable relationship between actual damages and the punitive award as one factor in attempting to control the jury's discretion. Such a rule, however, is unnecessary, if not outmoded, in the context of the multiple party suit where other factors tend to protect against excessive verdicts.

**163.** *Sindell v. Abbott Laboratories*, 26 Cal.3d 588, 611, 607 P.2d 924, 163 Cal.Rptr. 132, *cert. denied, sub nom. E.R. Squibb & Sons, Inc. v. Sindell*, 449 U.S. 912, 101 S.Ct. 285, 66 L.Ed.2d 140 (1980).

punitive damages,[164] this court has several options open to it in order to resolve the conflict. First, the court could achieve a compromise to accommodate both policies such as taking the different laws into account when an individual from the affected state makes her claim on the class fund.[165] Second, the court could determine a consensus of shared values or policies in formulating a "compromise" standard.[166] Finally, the defendant has expressed an interest in stipulating to the most "liberal" standard of punitive damages, in which case the plaintiffs would benefit from the application of non-forum law.

Notwithstanding the various theories advanced above, any manageability problems posed by the existence of various states' laws does not rise to the level of a *bona fide* reason to deny certification at this time.

*Discovery Regarding Basis of Class Action*

Plaintiff's counsel disputes the existence of a limited fund in these actions and argues that extensive discovery should be conducted as to the existence of a Rule 23(b)(1)(B) class. Counsel contends, therefore, that this court's certification opinion is premature.

It is now well-recognized that discovery may be utilized to ascertain evidence relating to the presence or absence of the class action requirements.[167] However, the

decision whether or not to grant extensive discovery in connection with class action determinations lies within the sound discretion of the trial court.[168] This broad discretion should be exercised only when the record before the court is so incomplete as to the presence or absence of the requisite factors that a conditional certification would irreparably harm the plaintiffs or defendants.[169]

A prolonged period of discovery regarding class issues is unnecessary in this litigation. In the instant case, the plaintiffs and defendants have conducted extensive and wide-ranging discovery over a period of years while these cases were at multidistrict litigation.[170] Additionally, the decision to certify a class in this litigation has been made only after reviewing a series of affidavits and briefs on the class issues filed over the course of the last year. This court has reviewed carefully the entire history of this litigation and the number of conflicting claims for punitive damages filed nationally.

The argument that the court's certification is premature is flawed for two reasons. First, the plaintiff's counsel offers no suggestion as to what facts justify delaying this court's determination. Plaintiff's counsel himself presents an array of presently

---

**164.** Of course, variations in standards governing the amount, as opposed to the basis, of a punitive damage award may well represent a "procedural" law and call for the application of California's law notwithstanding the difference.

**165.** *See* Twerski & Mayer, Toward a Pragmatic Solution of Choice of Law Problems—At the Interface of Substance and Procedure, 74 Nw. L.Rev. 781 (1979).

**166.** *See* Trautman, A Comment on Twerski and Mayer: A Pragmatic Step Towards Consensus As a Basis For Choice-of-Law Solutions, 7 Hofstra L.Rev. 833 (1979).

**167.** *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 347 n.13, 98 S.Ct. 2380, 2387 n.13, 57 L.Ed.2d 253 (1978); *Kamm v. California City Development Company*, 509 F.2d 205, 209–10 (9th Cir. 1975); *Kronenberg v. Hotel Governor Clinton, Inc.*, 41 F.R.D. 42, 44–45 (S.D.N.Y. 1966); Annotation, Discovery for Purposes of

Determining Whether Class Action Requirements Under Rules 23(a) and (b) of the Federal Rules of Civil Procedure Are Satisfied, 24 A.L.R.Fed. 827 (1975); Kubin, Determining Class Maintainability in California, 27 Hastings L.J. 293, 304–05 (1975).

**168.** *Kamm v. California City Development Company*, 509 F.2d 205, 209 (9th Cir. 1975); *Berland v. Mack*, 48 F.R.D. 121, 126 (S.D.N.Y. 1969).

**169.** *See, e. g., Wolfson v. Solomon*, 54 F.R.D. 584 (S.D.N.Y.1972).

**170.** *A. H. Robins Co. "Dalkon Shield" IUD Products Liability Litigation*, 406 F.Supp. 540 (Jud.Pan.Mult.Lit.1975). Moreover, the limited reopening of discovery before Judge Theis should be available to this court by the time this class action goes to trial.

known facts regarding the incidence and potential for punitive damage awards.[171]

Assuming, arguendo, that the record does not fully demonstrate facts pointing to threatened bankruptcy of the corporate defendants, the existence of conflicting interests among plaintiffs as to a limited punitive damage "fund" is a conceptual certainty. With over 1800 claims filed nationally, it requires no clairvoyant power to conclude that judges in subsequently filed lawsuits will rule as a matter of law that the defendants have been punished enough and dismiss a plaintiff's claim for exemplary damages. The facts as to this possibility of "legal roulette" on the punitive damages issue is well-established at this point in the litigation.[172]

Second, it is well-recognized that early determinations of class status should govern as a general rule.[173]

> [I]f there is error to be made, let it be in favor and not against the maintenance of the class action, for it is always subject to modification should later developments during the course of trial so require.[174]

Admittedly, early certification decisions pose the danger that courts will misjudge the viability of the class. However, in most cases, including the present one, the prejudice resulting from an early determination is minimal in light of the court's ability to revise or reverse its order if post-certification discovery reveals the impropriety of a class suit.[175] Rule 23(c)(1) provides that an order certifying class status may be "altered or amended before the decision on the merits." Accordingly, the certification has been made conditionally, subject to revision if facts develop leading the court to revise its previously announced position.[176]

The undesirability of a lengthy class action discovery period is underscored by the posture of this litigation. Thousands of cases remain pending nationally in both state and federal courts concerning injuries allegedly caused by the defendants' product. Further delay in deciding the important issues raised herein necessarily impedes the progress of those lawsuits. The policy behind "early" certification applies with special force to these cases as further delay threatens continuing deprivation of the plaintiffs' and the defendant's constitu-

---

**171.** *See* Bradley Post's Letter to the Court, June 17, 1981.

**172.** It appears that plaintiffs' lawyers are arguing at cross-purposes, attempting to run with the hares and chase with the hounds, regarding this issue. On the one hand, some lawyers for plaintiffs, as those here calling for further discovery, suggest that there is "no historical evidence of punitive damage awards" against this defendant. On the other hand, plaintiff's counsel argues vigorously that this defendant has engaged in malicious, oppressive and wilful conduct and that a single determination of the punitive damage issue deprives each plaintiff of a valuable and guaranteed right.

Certainly if the former is true, a publicized class action for the express purpose of permitting jury review of all pending cases and alleged misconduct would inure to the benefit of all plaintiffs and society as difficulties in proving punitive damages present in individual suits would be greatly reduced in the class action.

If, on the other hand, the latter argument is true, individual plaintiffs present conflicting demands on a limited fund. *See* notes 33 to 40 *supra.*

**173.** In fact, Fed.R.Civ.P. 23(c)(1) requires that the trial court make its determination as to class maintainability "as soon as practicable."

As a practical matter, the courts which have permitted further discovery have done so to avoid the possibility of precipitate decisions *denying* certification of plaintiffs' classes. Courts have reasoned that where a class action will save judicial time and protect collective interests, early denial without discovery is judicially unwise. *See Kamm v. California City Development Company,* 509 F.2d 205, 209, 210 (9th Cir. 1975); *Yaffe v. Powers,* 454 F.2d 1362, 1367 (1st Cir. 1972); Article, Developments in the Law of Class Actions, 89 Harv.L.Rev. 1318, 1423 (1976).

**174.** *Esplin v. Hirschi,* 402 F.2d 94, 99 (10th Cir. 1968), *cert. denied,* 394 U.S. 928, 89 S.Ct. 1194, 22 L.Ed.2d 459 (1969). *Accord, Grad v. Memorex Corp.,* 61 F.R.D. 88, 94 (N.D.Cal.1973).

**175.** *See, e. g., Harriss v. Pan American World Airways, Inc.,* 74 F.R.D. 24, 35–37 (N.D.Cal. 1977).

**176.** *Social Services Union, Local 535 Service Employees International Union, AFL–CIO v. Santa Clara,* 609 F.2d 944, 948–49 (9th Cir. 1979).

tional rights. Accordingly, the most prudent course is to certify this class and consolidate discovery of facts regarding the existence of a "limited fund" with the trial of this case on the merits.[177]

## CERTIFICATION FOR INTERLOCUTORY APPEAL

This case presents important issues of national significance. As such, this court's certification order is an ideal candidate for interlocutory appeal pursuant to 28 U.S.C. § 1292(b).[178]

The court is of the opinion that its order involves a controlling question of law as to the certification of a national class action on punitive damages and a statewide class on all issues of liability. It is plain that there is substantial ground for difference of opinion as to these questions.

The court is of the further opinion that an immediate appeal of this order may materially advance the ultimate termination of this litigation as to all parties, inasmuch as an immediate resolution of these issues undoubtedly will lead to increased settlements and save thousands of hours of court time.

Swift resolution of the questions raised in this court's class order on an expedited basis is of prime importance. The trials of hundreds of actions across the country await the determination of the questions raised herein. Thousands of individual plaintiffs independently are seeking punitive damages against the defendant for essentially the same conduct. The plaintiffs and the defendants as well as courts nationwide stand to gain from an immediate decision of these questions.

The court will not certify its previously announced decision to consolidate the cases before it.[179] In deciding whether consolidation under Rule 42(a) would be desirable federal district courts are vested with a wide range of discretion.[180] There is virtually no dispute that a consolidated trial of these actions would reduce overlapping issues, duplication of proof and waste of the court's time. In the present case, all parties appear to concede this court's authority to consolidate the 165 cases pending before it.

## TRIAL OF THE CLASS ACTION

Since this court's June 25, 1981 order certifying these cases as a class action, counsel for both sides commendably have met and established a coordinated approach to the pretrial of this action. Representative parties have been selected who cover the broadest possible gamut of types of injuries and background necessary for a jury to understand the depth and breadth of this litigation. Schedules were made for the orderly exchange of trial information and some attempts were made to correlate the discovery necessary for trial.

The trial of this action firmly is set to begin on May 10, 1982, and this court will clear its calendar for the requisite length of trial.

As presently envisioned, the trial of this lawsuit will proceed as follows:

First, the named representatives will present their case on their various liability theories and the parties will present evidence relating to the different warning periods relevant to the "defective" product issue.

Second, some, if not all, of the named representatives will continue on with the individual aspects of their lawsuits includ-

---

**177.** It is, of course, established that *preliminary* inquiries into the *merits* of a class action suit are unauthorized by Rule 23. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177, 94 S.Ct. 2140, 2152, 40 L.Ed.2d 732 (1974). To that extent, extensive discovery, which necessarily will become entangled with the issues on the merits, should be avoided.

**178.** Class action certification orders are properly appealed under section 1292(b). *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 475, 98 S.Ct. 2454, 2461, 57 L.Ed.2d 351 (1978), Schickle and

Geisinger, Interlocutory Appeals Pursuant to 28 U.S.C. § 1292(b) and Their Use in Class Actions: Discretion Displaces the Death Knell, 15 U.S.F.L.Rev. 321 (1981).

**179.** *In re Northern District of California's "Dalkon Shield" IUD Products Liability Litigation*, 521 F.Supp. 1188 (N.D.Cal.1981).

**180.** *Moten v. Bricklayers, Masons & Plasterers International Union of America*, 543 F.2d 224 (D.C.Cir.1976).

ing damages and causation. The jury will be instructed that these parties are representatives of individuals in a larger class who will present their individual cases on causation and damages to other juries in subsequent actions.

Third, the lawsuit will continue with the punitive damages phase of the trial. The same named parties, now representing a cohesive national class, will be allowed to present evidence to the jury regarding all issues relevant to a determination of the punitive damages question, including but not limited to, evidence of the defendant's wealth, the nature and number of the injuries allegedly caused by the defendant's product, and the extent to which the defendant's conduct was malicious, wilful, and oppressive.[181]

Fourth, the jury will be given several interrogatories on the various issues and it also will be asked to award a sum as punitive damages to punish the defendant once, and for all potential claimants if liability is found to exist.[182] Fifth, if the jury's determination on liability is in favor of the class, each class member in the statewide class will return to her own court for a separate trial on individual issues such as causation, affirmative defenses and damages.

Sixth, if the jury renders a verdict in favor of the nationwide class and awards punitive damages, the amount will be established as a fund from which all successful claimants will be entitled to a pro-rata share[183] at the end of some reasonable period of time.[184]

The trial of this class action poses some exciting possibilities for a most effective presentation of this case to a jury. Many witnesses, particularly those otherwise unavailable to other jurisdictions, could be videotaped professionally for both replacement testimony in later trials as well as part of a "preview" presentation to give future juries on the individual issues a "flavor" of the class findings on liability.[185] Maximum cooperation on evidentiary disputes might be expected in light of both parties' interest in a single determination of the class issues. Finally, an early trial date undoubtedly will yield maximum cooperation in continuing discovery questions that must be resolved before the trial of this case.

## CONCLUSION

Within the parameters of the due process clause, judges should not hesitate in devising methods to avoid the relitigation of identical disputes. This admonition does not contravene the historical role of the judiciary since the power to affect judicial economy over a swelling caseload is of ancient origin. The exercise of this power is compelling when the traditional mode of litigating cases on a piecemeal basis deprive large numbers of plaintiffs of a practical means of redress.

This class action is not the proverbial "Frankenstein monster"[186] posing as a class

---

181. See note 155 supra.

182. This court is convinced that a jury, called upon to determine the amount of damages necessary to punish and deter the defendant for all alleged wrongdoing involving the sale and promotion of the Dalkon Shield, will, when presented with all the facts, be capable of awarding a sum in damages adequate to accomplish the purpose of punitive damages.

183. This court has not, of course, determined the precise method by which successful claimants (by both trial and settlement) would draw from the fund. Two possible alternatives would be a straight pro-rata share based on the total number of claimants or a pro-rata share based on the amount of money paid by the company in actual damages relative to that secured by other claimants.

184. The class necessarily will close at some time. However, in light of the existence of a statute of limitations, the number of claimants, which is increasing today, will dwindle to a minimal or nonexistent number at some definite point in the future. See Nelson v. A. H. Robins, 515 F.Supp. 623 (N.D.Cal.1981), for an example of this court's approach to the statute of limitations issue in this state.

185. See generally G. Kornblum, Videotape in Civil Cases, 24 Hastings L.J. 9 (1972).

186. See, e. g., San Antonio Tel. Co. v. American Tel. & Tel. Co., 68 F.R.D. 435, 436 (W.D.Tex. 1975).

suit. On the contrary, this action is a way of subduing the monster-like qualities of that special type of repetitive litigation so much the result of our modern technological society.[187]

Imaginative judicial management of massive litigation is essential in controlling and expediting cases so that individual plaintiffs will not be overwhelmed by litigation costs and litigation-wise corporate defendants. Similarly, judicial control of these lawsuits permits a defendant to avoid potential "punitive damages overkill" which is in direct contravention to the purpose of such awards.

The prophylactic potential of the class action device is obvious in cases where consolidated treatment of the punitive damages question provides plaintiffs an equal incentive to punish a defendant for its alleged conduct. By its very nature, a large class action suit produces incidental benefits such as added publicity to potentially unknowing class members, top-flight presentation of evidence and necessary cooperation between the parties. Therefore, the class action in these cases serves to achieve the greatest benefit for the greatest number of parties.

Accordingly, IT IS ORDERED that this action be maintained as a class action. The class shall be composed of the following:

All persons who have asserted claims for punitive damages against A. H. Robins Company relating to the Dalkon Shield and all plaintiffs in litigation relating thereto pending in federal courts located in California.

IT IS FURTHER ORDERED that this order shall be subject to alteration or amendment before the decision on the merits as authorized by Rule 23(c)(1) of the Federal Rules of Civil Procedure. Any proposed alteration or amendment desired by a party shall be brought before the court as soon as practicable following discovery of the facts believed to warrant it.

IT IS FURTHER ORDERED that this court's order certifying class actions in this lawsuit is certified for interlocutory appeal pursuant to 28 U.S.C. § 1292(b).

IT IS FURTHER ORDERED that by November 25, 1981, counsel for the parties prepare and submit to the court a proposed form of notice to be sent by the defendant to members of the class.

IT IS FURTHER ORDERED that all parties prepare for the trial of this action scheduled to begin on May 10, 1982.

IT IS FURTHER ORDERED that the parties submit briefs to this court by February 8, 1982, on the choice of law issues applicable to the punitive damage issue.

IT IS SO ORDERED.

**187.** Miller, Of Frankenstein Monsters and Shining Knights: Myth, Reality, and the "Class Action Problem," 92 Harv.L.Rev. 664, 667–70 (1979).